## NEILSEN *v.* JESUP and others.

*(District Court, S. D. New York.  March 4, 1887.)*

1. DEMURRAGE—BILL OF LADING—HOLDER'S LIABILITY—SUBCONTRACTS.

   A vessel, in delivering cargo, is not bound to look beyond the owner and holder of the bill of lading.  As he has the control of the delivery and acceptance of the goods, he is responsible, on accepting the goods under the bill of lading, for freight and demurrage according to its terms.  He cannot relieve himself from responsibility by subcontracts for a delivery to others, who do not act directly under the bill of lading, but only under the consignee's orders.

2. SAME—CASE STATED.

   J., the owner and consignee of certain iron rails, sold them to arrive, to a railroad company, to be delivered "*ex* ship, free of duties; terms, cash on handing invoice and order on vessel when they arrive in New York."  On arrival, J. entered the goods at the custom-house, and paid duties and freight.  P. & C., who had acted as agents for J. in some matters concerning the rails, procured the ship a berth, and received from J. the invoice and order on the vessel for delivery, with a request to collect payment from the railroad company, which they subsequently did.  There was unreasonable delay in unloading the ship, partly in removing the iron from the dock, and partly through difficulty in getting lighters.  *Held* that, whether or not P. & C. really acted in reference to the delivery of the iron for themselves or for the railroad company, J. was liable to the ship for the demurrage, and must look to his vendees or to P. & C. for his indemnity, if the delay was by their fault.

Libel for Demurrage.

*Wilcox, Adams & Macklin,* for libelant.

*Biddle & Ward,* for respondents.

BROWN, J.  On the thirty-first of May, 1880, the bark Porro arrived at this port with a quantity of iron rails, shipped at Cardiff by Guest & Co., to be "delivered at New York, unto order or assigns, he or they paying freight of said goods, and other conditions as per charter-party." The charter-party provided for the discharge "as fast as the custom of the port will admit," and for "demurrage over and above the lying days at fourpence per register ton per day."  The vessel was entered at the custom-house on the first day of June.  On the 3d she was ordered to South Third street, Williamsburgh, where she arrived the next day, got a berth, and was ready to discharge.  Part of the cargo was discharged on the dock and part into lighters.  The discharge on the dock was stopped because that already landed was not removed so as to permit more without incumbering the dock; and there was delay in sending lighters, in part, at least, through difficulty in obtaining them at that time.  Through these various causes, the cargo was not fully discharged until June 25th.  Fourteen days were a reasonable time to discharge, which should have been completed, omitting the intervening Sundays, at least by the 21st.

There is no custom proved that throws upon the ship the unnecessary loss of the remaining four days.  She is therefore entitled to demurrage for that time, and the only question is whether the respondents in this action are responsible for it.  The respondents, constituting the firm of

Jesup, Paton & Co., had in November previous bought 5,000 tons of Guest & Co.'s rails on joint account for themselves and Clark, Post & Martin, to be forwarded from Cardiff. On the twenty-second of December following they sold 2,000 tons to the Detroit, Mackinac & Marquette Railroad Company, to be delivered "*ex* ship) in the port of New York, free of all duties; terms, cash in New York, on handing invoice and order on vessel for the rails when they arrive in New York." Perkins & Choate, or their predecessors, had acted as agents of the respondents in the purchase; and, in consequence of delays in the receipt of the iron from Europe, it would seem that they had supplied, by way of loan, a part of the 2,000 tons contracted to be sold to the railroad company, which was to be returned to them out of the shipment in question. It was they personally who dealt with the master, selected a berth, and directed the master to it, and attended to procuring lighters. On the second of June, Jesup, Paton & Co., as indorsees and holders of the bill of lading, made due entry at the custom-house of the rails brought by the Porro, in their own names as owners; inclosed a custom-house permit, bill of lading, and invoice to Perkins & Choate, and requested them to collect from the railroad company the amount due upon its purchase. On the ninth of July the respondents acknowledged the statement of Perkins & Choate of the eighth, with their inclosure of a check for $48,235.09 to cover the balance due for rails "per Ariel and Porro." The freight was paid in full by respondents,—a part during the course of the discharge, and the balance after the discharge was completed.

Upon these facts, I am of opinion that the respondents are liable for the demurrage, although their vendees may have been in fault, and may be bound to indemnify the respondents for the delay. The liability for demurrage was in this case a part of the express contract of the bill of lading. BETTS, J., in *Sprague* v. *West*, 1 Abb. Adm. 548, 554, describes demurrage as "only an extended freight or reward to the vessel in compensation of the earnings she is improperly caused to lose." In this view, the consignee who is liable for freight would be equally liable for demurrage. I have not been referred to any case sustaining a severance as to these liabilities under circumstances like the present.

The general rule undoubtedly is that the consignee and indorsee of the bill of lading who is owner of the goods and of the bill of lading, and who accepts the goods under the bill of lading, is bound by its terms. If he accepts the goods under the bill of lading, he is presumed to agree to pay the stipulated freight, and to receive the goods within a reasonable time, or within the agreed time, or else pay what the bill of lading requires for the delay. He cannot by his subcontracts with others shift his responsibility upon those who do not become parties to the bill of lading, and do not thereby assume any direct relations with the ship, nor acquire any legal control of her movements, nor owe her any legal duty. The vessel is not bound to look beyond the owner and holder of the bill of lading, because he has the right to control the delivery and the acceptance of the goods under it. *The Thames*, 14 Wall. 98, 107.

For any unreasonable delay in the acceptance of the goods, and in enabling the ship to deliver, he is therefore primarily responsible. To avoid this responsibility, he must either refuse acceptance, or find some other person who, both as vendee of the goods and as assignee and holder of the bill of lading, becomes substituted in his place and to his rights and liabilities, through direct relations with the ship under and by virtue of the bill of lading. This is precisely what neither the railroad company nor Perkins & Choate did in this case. The terms of sale to the railroad company were: "All duties paid, and cash on handing invoice and order on vessel," after arrival. These terms, it will be observed, did not include any indorsement or delivery of the bill of lading. The opposite was plainly intended, because the respondents were to pay the duties, and hence were to enter the goods as theirs; to do which the bill of lading must have been held and used by them as their own, as in fact it was. This fixed the right of the ship to hold the respondents, and to look to them alone for freight, and for a timely acceptance of the goods, in order to enable the ship to earn her freight without unreasonable delay. The fact that the railroad company had agreed to take the goods *ex* ship, and on receipt of the invoice and order upon the ship, might charge that company for the delay as between it and the respondents. That did not relieve the latter. The liability of the company would depend, not only upon the terms of its contract, but upon the notice it received from the respondents under the contract. The notice itself might have been long delayed, or insufficient, or the papers delivered imperfect. With none of these things had the ship anything to do. She owed no duty directly to the railroad company, but only to the respondents, as the consignees and holders of the bill of lading, to deliver according to the orders of the latter. Any persons receiving goods, or dealing with the ship, under the respondents' orders, and not directly under the bill of lading, dealt with the ship, as between her and the respondents, as the representatives only of the latter in receiving the goods. *Fowler* v. *Knoop*, 4 Q. B. Div. 299.

The libelants are therefore entitled to a decree.