TAYLOR et al. v. FALL RIVER IRONWORKS (two cases).

(District Court, S. D. New York. September 10, 1903.)

1. SHIPPING—DEMURRAGE—ASSUMPTION OF LIABILITY BY CONSIGNEE.

Respondent contracted in England for two cargoes of coal, to be delivered alongside the vessels at New York, and discharged at the rate of 1,000 tons per day. The sellers chartered vessels for carrying the coal from libelants, the charter parties containing the usual cesser clauses providing that the charterers' liability should cease when the cargo was shipped, and that the owner should have a lien on the cargo for demurrage, and also requiring the cargoes to be discharged by the consignees. Bills of lading were issued, which provided that all the terms and conditions of the charter parties were incorporated therein, and drafts for the price of the coal, with bills attached, were presented to and paid by respondent before the arrival of the vessels. *Held*, that, while not bound thereto by the contract of purchase, respondent, by paying the drafts and accepting the coal under the bills of lading, was bound, as between itself and libelant, by the provisions of the charter parties, and

---

¶ 1. Demurrage, see notes to Randall v. Sprague, 21 C. C. A. 337; Hagerman v. Norton, 46 C. C. A. 4.

became responsible for the discharge of the vessels and for demurrage, where such discharge was not made at the stipulated rate.

**2. SALE—CONSTRUCTION OF CONTRACT—PASSING OF TITLE.**

A contract made by cable for the purchase of a specified number of tons of coal to be shipped by the sellers from England is not one of absolute sale of any specified coal, so as to pass the title at once, but is executory, and the title did not pass in any event until the coal was laden for shipment.

**3. SHIPPING—DEMURRAGE—AUTHORITY TO BIND CARGO.**

Where, by a contract for the purchase of coal, it was to be shipped by the sellers from England, and delivered to the purchaser at New York, the sellers were authorized to contract for the carriage of the coal either as owners from whom the title had not passed or as agents for the purchaser, and by such contracts to subject the coal to a lien for demurrage.

**4. SAME—ESTOPPEL TO DENY LIABILITY.**

Where, pending the discharge of cargoes of coal, the consignees admitted their liability for demurrage, provided any was due, which, however, they denied, and the shipowners, in reliance thereon, allowed the cargoes to be discharged without asserting their lien, the consignees were estopped to defend a suit for demurrage on the ground that another was the proper party to be sued therefor.

**5. SAME—EVIDENCE CONSIDERED—RESPONSIBILITY FOR DELAY IN DISCHARGING.**

Evidence *held* to show that delay in the discharge of cargoes was not due to any fault or lack of equipment on the part of the vessels, but to causes which entitled them to recover demurrage therefor.

In Admiralty. Suit for demurrage.

Butler, Notman, Joline & Mynderse (Frederick M. Brown, of counsel), for libelants.

Wilson & Wallis (William G. Wilson, of counsel), for respondent.

HOLT, District Judge. These are two suits, brought by the firm of Charles M. Taylor's Sons against the Fall River Ironworks, to recover demurrage for delay in unloading two cargoes of coal shipped from Cardiff to New York on the steamers North Point and Montauk Point. In the early part of October, 1902, the Fall River Ironworks purchased by cable from Mann, George & Co., of London, 11,000 tons of Welsh coal. The contract provided that the coal should be delivered free alongside at New York. The Fall River Ironworks, therefore, under its contract with Mann, George & Co., was under no obligation to discharge the cargo. All it had to do was to receive it. After making this contract, Mann, George & Co. chartered from Charles M. Taylor's Sons, the libelants, two steamships, the North Point and the Montauk Point, to transport the coal to New York. The charter parties provided that the consignees should effect the discharge of the cargo. The charter parties also contained the usual cesser clauses providing that the charterers' liability should cease as soon as the cargo was shipped, and that the owner should have a lien on the cargo for demurrage or other claims arising at the port of discharge. The steamers were loaded at Cardiff with the coal, and a bill of lading was issued for each cargo, which provided that all the terms and conditions contained in the charter party were incorporated in the bill of lading. The two steamers, after being loaded, proceeded to the port of New York. Mann, George & Co. drew drafts, accompanied by the bills of lading, for the price of the coal, which were duly paid before the representatives at New York

of the Fall River Ironworks saw a copy of the charter parties. As soon as they saw a copy, they wrote to the representatives at New York of the Messrs. Taylor, declining to accept the clause of the charter parties requiring the consignees to effect the discharge of the cargo. Considerable correspondence ensued, the substance of which was that the representatives of the Fall River Ironworks insisted that by the contract with Mann, George & Co. the Fall River Ironworks was not obligated to select a berth, or employ stevedores, or do anything in relation to the discharge of the cargoes, while the representatives of the Messrs. Taylor claimed that by the provisions of the charter parties the consignees were to attend to the discharge of the cargo. The controversy having been brought to the attention of Mann, George & Co., they directed an agent at New York to obtain berths, employ stevedores, and do whatever was necessary to discharge the cargo, and the agent thereupon proceeded to do so. The North Point was sent to Pier 19, East River, New York, and the Montauk Point to the foot of Forty-Second street, South Brooklyn. The cargoes were there unloaded into barges provided by the Fall River Ironworks. The Fall River Ironworks made the application for the entry of the coal at the custom house, and in the papers filed there asserted that it owned the coal under the bills of lading. It paid the duties on the coal, and, as the owner of the coal under the bills of lading, received the custom-house permit under which the coal was discharged from the steamers. Neither of the cargoes was unloaded at the rate of 1,000 tons per day, and these actions are brought to recover demurrage for the delay.

The contract under which the Fall River Ironworks purchased the coal provided that the coal should be discharged at the rate of 1,000 tons a day, but it imposed no duty on the Fall River Ironworks to obtain berths for the steamers, employ stevedores, or have anything to do with discharging the cargo, except to receive it alongside the steamers. It consistently refused to effect the discharge. The charter parties, however, provided that the consignee should effect the discharge of the cargo, and the terms and conditions of the charter parties were incorporated into the bills of lading. The effect of these provisions in the charter parties and the bills of lading was, in my opinion, that, as between the Messrs. Taylor and the Fall River Ironworks, the Fall River Ironworks was bound, if it received the coal under the bills of lading, to be responsible for demurrage under the provisions of the charter parties. The Messrs. Taylor were not obliged, under the charter parties, to attend to obtaining berths for the steamers, or to have anything to do with discharging the cargo, except to furnish the necessary steam, and the winches and other standing appliances for unloading, and to allow 25 cents a ton towards the expense. Undoubtedly, the Fall River Ironworks had not agreed to attend to the discharge, and was not under any obligation to do it, but, if it chose to accept the coal under the bills of lading, it was bound to comply with the provisions of the bills of lading. Neilsen v. Jesup (D. C.) 30 Fed. 138.

The respondent's counsel argues that the respondent never agreed to discharge the cargo; that it persistently refused to have anything

to do with discharging it; that Mann, George & Co. did discharge it; and that, therefore, Mann, George & Co. are the parties liable for any demurrage due for delay in discharging. But the libelants, by the cesser clause in the charter parties, had agreed not to hold Mann, George & Co. for demurrage on unloading at New York, but to hold the consignee, through the lien on the cargo provided for in the charter parties. It is true that the respondent did not know the contents of the charter parties until after it paid for the coal; but it received the bills of lading when it paid for the coal, and knew from them that by the terms of the bills of lading it took the coal bound by any conditions in the charter parties. Moreover, the cable contract between the Fall River Ironworks and Mann, George & Co. provided that the coal should be discharged at the rate of 1,000 tons a day. The respondent, therefore, would naturally expect that the charter parties would contain such a condition, with the usual provisions for demurrage and the usual cesser clause giving a lien on the cargo for demurrage. The respondent, therefore, in my opinion, took the risk of being bound by any conditions of the charter parties when it paid for the coal, and took the risk of being held liable for any demurrage when it received the coal.

On the merits, the evidence satisfies me that the steamers were fitted with all the necessary appliances, and that each could have discharged at least 1,000 tons a day, even without breasting out the vessel, and without night work. The facts that the berths where the cargoes were discharged were narrow, that the barges employed were of an inconvenient size and were decked over, that frequently the work was necessarily interrupted to enable other vessels to use the slip, and that only a part of the hatches which could have been worked at one time were worked, sufficiently account, in my opinion, for the result that much less than 1,000 tons a day were discharged. If the steamers had been breasted out, and night gangs had worked, 1,000 tons a day could certainly have been discharged; and, if that was necessary to be done, and was not done, demurrage is due. Egan v. Barclay Fibre Co. (D. C.) 61 Fed. 527; McCaldin v. Cargo of Iron (D. C.) 111 Fed. 411.

The respondent's counsel argues that this was an absolute sale of specific property, so that the title to the coal passed to the Fall River Ironworks as soon as the contract was completed by cable; that, therefore, Mann, George & Co. had no right to subsequently impose any lien on the coal without its authority; that no such authority was conferred by the contract of purchase or in any other manner; and therefore that the provisions in the charter party attempting to impose a lien for demurrage were a nullity. I am not able to concur in this reasoning. In the first place, I think that this was not a purchase of any specific property. It was a general purchase of a quantity of coal, to be selected out of a mass of similar coal. The coal which was shipped may not have been even mined when the contract was made. Although the contract of purchase by cable was complete, the contract was executory, and no title passed until the specific goods to be delivered to the vendee were set apart and appropriated to that purpose. Benjamin on Sales, § 352 et seq. I think, therefore,

that no title to the coal in question passed to the Fall River Ironworks before its delivery on board the steamers at Cardiff; and, in view of the facts that the contract provided that the coal was to be delivered in New York, and that Mann, George & Co. transported it to New York, on steamers which they chartered, instead of delivering it to a common carrier for transportation, and thereby retained possession until delivery at New York, I think it doubtful whether any title passed until the delivery of the coal in New York. But it seems to me that the question when the title passed is immaterial. If it remained in Mann, George & Co. until the coal was delivered on board the steamers at Cardiff, the Messrs. Taylor had a right to make any agreement with Mann, George & Co. in relation to its transportation that they saw fit. Even if it should be held that the title to the coal passed before it was delivered on board the steamers, I think that, under the circumstances of the case, Mann, George & Co. would be held to have been agents of the purchasers for the purpose of making arrangements for the transportation of the coal to New York, and that the Messrs. Taylor had a right to make any agreement with them as such agents which they deemed necessary in regard to the terms and conditions of affreightment. Nelson v. Hudson River R. Co., 48 N. Y. 498; Jennings v. Grand Trunk Ry. Co., 127 N. Y. 438, 28 N. E. 394. Mann, George & Co. would have had, as such agents, apparent general authority, and the fact that their authority was restricted by the terms of their contract with the Fall River Ironworks could not bind the Messrs. Taylor. The Messrs. Taylor apparently knew nothing about the contract between the Fall River Ironworks and Mann, George & Co., and in chartering their vessels to Mann, George & Co. they of course had a right to insert such provisions in the charter parties and the bills of lading as they saw fit to require.

If, however, for any reason, any party other than the Fall River Ironworks was liable for demurrage before the correspondence which took place between it and the libelants' counsel I think that by that correspondence it is now estopped from denying that it is liable, provided demurrage was justly due from anybody. The situation, when that correspondence took place, was this: Messrs. Taylor, by the cesser clause in the charter parties, had given up any claim on the charterers for demurrage, but they retained a lien for demurrage on the cargo, which, but for the provision in the charter parties, they would not have had; for the law gives no lien on cargo for demurrage. Abb. on Shipping (14th Ed.) 346. When the first steamer was partly unloaded the libelants' counsel wrote to the respondent, offering, in substance, not to subject it to the inconvenience which would result from the arrest of the cargo, and asking it to agree to appear in any action which might be brought for demurrage, and to admit that, if any demurrage were due, it was the proper party to be sued. The respondent answered that it was the proper party. In the reply to the second letter, to the same effect, in relation to the cargo of the second steamer, the respondent said, "We do not admit in any way that we are responsible for demurrage, because, according to our understanding, should there be any demurrage, it is the fault of the steamer discharging." In reliance upon these letters, the libelants allowed the

.cargo to be discharged, and their lien on it for demurrage lost, and I think that the respondent is estopped by them from now defending on the ground that some other party is liable for the demurrage. The respondent is entitled to defend on the ground that no demurrage is due from anybody, and particularly, as they stated in the second letter, on the ground that the delay was the fault of the steamer discharging; but it is not entitled, in my opinion, to defend the claim on the ground that the demurrage, although justly due, is due from some other party than the respondent.

My conclusion is that the libelants are entitled to a decree for the amount demanded in the libel, unless the respondent wishes to contest the amount due for demurrage, in which case the usual reference to ascertain the amount will be ordered.