### YONE SUZUKI et al. v. CENTRAL ARGENTINE RY. CO., Limited, et al.

(District Court, S. D. New York.  June 27, 1921.)

1. **Shipping ⬳174—Implied promise by consignee, accepting cargo, to pay demurrage.**

   On delivery and acceptance of cargo, an implied promise by the consignee, to whom the bill of lading is assigned, arises to pay demurrage, for which the ship had a lien under the bill of lading.

2. **Shipping ⬳185—Ship entitled to lien under bill of lading for demurrage at either port.**

   A provision of a charter party, expressly incorporated by reference into the bill of lading, "steamer to have a lien for all freight, dead freight, and demurrage," *held* to give a lien for demurrage at either port of loading or discharge.

3. **Shipping ⬳185—Recital of prepayment of freight in bill of lading estops ship from asserting lien for freight against assignee of bill.**

   Where a bill of lading contained a recital that the freight was prepaid, an assignee of such bill, receiving the cargo, cannot be held liable for an unauthorized deduction from the freight money made by the shipper.

In Admiralty.  Suit by Yone Suzuki and others against the Central Argentine Railway Company, Limited, and others.  On exceptions to answer of defendant Railway Company.  Sustained in part.

This cause comes up on exceptions by the libelants to four articles of the answer of the Central Argentine Railway Company, one of the respondents in personam.  The libel was filed primarily against the charterer of two Japanese schooners, owned by the libelants and chartered each for a voyage from Hampton Roads, Va., to Buenos Ayres, Argentine, with a cargo of coal.  The Central Argentine Railway Company, Limited, is sued as consignee of the coal and holder of a bill of lading of the whole cargo in each ship, and the circumstances on which the liability arises are as follows:

The charters provided, among other things, for lay days for loading and discharge, and demurrage at 48 cents per gross registered ton for each day that the ship was held beyond the lay days.  It also contained the following provisions material hereto:

"8. Bills of lading to be signed without prejudice to this agreement at not less than rates as stated herein."

"9. The liability of the party of the second part (the charterer) shall cease and terminate as soon as cargo is loaded and the freight is paid, steamer to have a lien upon the cargo for all freight, dead freight, and demurrage, and all and every other sum or sums of money which may become due the steamer under this contract of affreightment."

The libel alleges that there were delays beyond the lay days both at the port of loading and the port of discharge, from which arose demurrage; also that

⬳For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

at the port of discharge the ships had to pay various charges for stevedoring and the like, properly payable by the respondents, which they refused to meet. It further alleges that at the port of loading the charterers deducted certain of the freight money due under a false claim of dispatch money, as provided in the charter party. This deduction the libelant claims in addition to the loading demurrage and the demurrage and charges at the port of discharge. It further alleges that the master of each steamer signed a single bill of lading for the whole cargo to be transported to Buenos Ayres to "order or assigns he or they paying freight for the same as per charter party, dated February 16, 1920, all the terms and exceptions contained in which charter are herewith incorporated." It finally alleges that the respondent Central Argentine Railway Company, Limited, "became the owner of said bill of lading and entitled to said cargo, * * * subject to the conditions and exceptions of said bill of lading and of the aforesaid charter party of February 16, 1920, including the claim for demurrage at loading port and unpaid balance of freight as aforesaid," and that after much delay it took delivery of the coal under this document.

The articles of the answer excepted to allege that the Central Argentine Railway Company, Limited, took discharge of the cargo from the ship's tackle, and that by reason thereof the ship's lien was lost and the respondent was not liable. As to the charge for freight deducted, the answer alleges that the bill of lading under which the cargo was shipped provided, among other things, that "freight on the cargo had been prepaid," that by reason of that provision the lien, if any, was not incorporated into the bill of lading, and the respondent, in taking delivery, received it free from any lien for unpaid balance of freight.

George C. Sprague, of New York City, for exceptant.

Edwin Serre Murphy and L. De Grove Potter, both of New York City, for respondent.

LEARNED HAND, District Judge (after stating the facts as above). [1] The liability for demurrage comes first, and this may be divided into two parts, demurrage at the port of loading and demurrage, and charges at the port of discharge. As to the latter, the authorities are so numerous and uncontradicted that nothing more need be done than cite them, Neilsen v. Jesup (D. C.) 30 Fed. 138; Gates v. Ryan (D. C.) 37 Fed. 154; Sutton v. Housatonic (D. C.) 45 Fed. 507; Taylor v. Fall River Iron Works (D. C.) 124 Fed. 826; Crowley v. Hurd (D. C.) 172 Fed. 498; Vane v. A. M. Wood & Co. (D. C.) 231 Fed. 353; Union Pac. R. R. Co. v. American Smelting & Refining Co., 202 Fed. 720, 121 C. C. A. 182. As I said in Vane v. A. M. Wood & Co., supra, the liability of the consignee appears to be regarded as arising from an implied contract; the lien being surrendered upon a promise to pay the charges. The promise should be commensurate with the lien, as was expressly held in White & Co. v. Furness Withey & Co. [1895] A. C. 40. It is generally said that the surrender of the lien and acceptance of the goods are only prima facie evidence of a contract, which may be rebutted by other circumstances (Frontier S. S. Co. v. Central Coal Co., 234 Fed. 30, 148 C. C. A. 46 [C. C. A. 7th]), and that may be so. In any case the facts are here unrebutted and the liability clear.

[2] It has been sometimes supposed that the demurrage at the port of loading is on a different basis, and Mr. Carver, in his book (section 637), seems to recognize such a distinction. I do not, however, think that the authorities require it, and in a case like that at bar I cannot see

any ground for it in principle. In Smith v. Sieveking, 4 E. & B. 945, 5 E. & B. 589, the language of the bill of lading was interpreted as binding the ship only for the payment of freight, and the case went off on that point in both counts. Baron Parke said that the language of a bill of lading must be very clear to indicate the intent to hold the goods for delays at the port of loading not in any way due to defaults of the consignee. Yet the case stands for no more than a rule of interpretation. Moreover, in Gray v. Carr, L. R. 6 Q. B. 522, the lien was extended to demurrage under the charter party at port of loading, though damages and dead freight were not thought to be clearly enough included by the words "he or they paying freight and all other conditions * * * as per aforesaid charter party." The question is therefore of the extent of the ship's lien, and the lien depends altogether upon the language of the bill of lading and the charter party.

In the case at bar the language of the bill of lading was:

"He or they paying freight for the same as per charter party, dated February 16, 1920, all the terms and exceptions contained in which charter are herewith incorporated."

There is no doubt, I think, that the word "terms" is broad enough to include any lien created by section 9 of the bill of lading. If so, the case turns upon the meaning of that section, which reads:

"Steamer to have a lien for all freight, dead freight and demurrage."

In Gray v. Carr, supra, the contest was over the scope of the word "demurrage," the charter party having fixed a period of 10 days after the lay days, as demurrage at a fixed rate. It was held not to include damages for "detention" after that period. But in the case at bar the charter party reads not so, but makes the demurrage rate apply indefinitely after the lay days expire, which are themselves to be calculated on a minimum speed of loading. It is true that in Gray v. Carr, supra, the language was such as made the word "demurrage" necessarily include only delays at the port of loading; but I think it equally clear here that the charter party here meant to include demurrage at either port. If so, the ship had a lien on the cargo for demurrage proper under this charter party. If the premise is commensurate with the lien (White & Co. v. Furness Withey & Co., supra; Vane v. Wood, supra), then it follows that the respondent is liable for all demurrage and the exceptions are well taken.

[3] As to the liability for freight, the case is different. I do not agree with the libelants that the deduction of freight under a false charge for dispatch money changed those charges into charges for demurrage. The charterer had wrongfully refused to pay the actual freight due, but it still remained freight money. The same considerations would apply to this unpaid freight as to the demurrage, were it not that the bill of lading recited that the freight was prepaid. That appears to me a clear estoppel, for a master who uttered such a bill of lading would be guilty of a fraud upon the consignee and innocent holder of a bill of lading, if he held the goods for freight. Besides, the charter party provides, in section 8, that the bill of lading shall be signed.

"at not less than the charter rate." Signing the bill of lading was a clear assertion by the master that the entire charter hire had been paid, since there was but one bill of lading for each cargo. Obviously the ship cannot permit the consignee to receive the cargo on the faith of such a declaration, and afterwards deny it and attempt to set up an obligation for a part of the hire. Therefore the exceptions to the twenty-second and twenty-third articles of the libel are overruled.