YONE SUZUKI & CO. et al. v. CENTRAL ARGENTINE RY., Limited, et al.

District Court, S. D. New York. March 4, 1927.

**1. Shipping ☞174—Indorsee of bill of lading incorporating provisions of charter party cannot resort to cesser clause to avoid demurrage liability.**

Under Argentine as well as United States and English law, an indorsee of a bill of lading incorporating the provisions of charter party has benefit only of those provisions of charter party which relate to cargo, and cannot, to avoid liability for demurrage, resort to cesser clause, providing that charterer's liability shall terminate as soon as cargo is loaded and freight paid, and that ship shall have lien on cargo for all demurrage.

**2. Shipping ☞174—Consignee, accepting cargo, held impliedly to promise to pay for demurrage under bill of lading giving ship lien for demurrage.**

Under Argentine law, consignee, accepting delivery of cargo under bill of lading incorporating terms of charter party giving vessel a lien on cargo for demurrage and all sums which may become due vessel under contracts of affreightment, impliedly promised to pay and is liable for demurrage, where shipowners delivered cargo without asserting right to apply for embargo thereof or to demand a deposit.

**3. Shipping ☞181(4)—Under charter providing that lay days shall commence 24 hours after arrival at or off port, lay days began 24 hours after vessel arrived at roads, 37 kilometers from basins and docks.**

Under charter party providing for carriage of coal to Buenos Aires or as near thereunto as steamer may safely get and always lie afloat, lay days for discharging to commence 24 hours after arrival at or off discharging port, whether steamer is in berth or not, held, that ships arrived at or off port when they reached the roads, and lay days began 24 hours thereafter, and were not extended during time that low water, due to direction of wind, prevented them from reaching a place at or off the designated berth, notwithstanding the roads were 37 kilometers from basins and docks.

**4. Shipping ☞181(1)—Charter requiring consignee to take not less than 1,000 tons daily from vessel held to establish rate for determining lay days.**

Charter party providing that cargo shall be taken from alongside of vessel by consignee named in bill of lading at port of discharge as quickly as steamer can deliver, but in no case at less than 1,000 tons per running day, held to require consignee to take not less than 1,000 tons daily, and lay days were to be ascertained by dividing quantity of cargo by 1,000.

**5. Shipping ☞184—Burden of proving what delay was due to vessel's fault held on consignee, as respects demurrage liability.**

As respects consignee's liability for demurrage under bill of lading, burden of proving what delay, if any, was due to fault of vessel, held on consignee.

**6. Shipping ☞175—Bill of lading imposing liens on cargo for demurrage held to make consignee liable for demurrage at loading port.**

Provision of charter party, expressly incorporated by reference into bill of lading, imposing liens on cargo for demurrage and all sums which may become due steamer under contract of affreightment, held to make consignee liable for demurrage incurred at loading port.

**7. Shipping ☞178—Where delay in discharging cargo was caused by consignee's sending vessels to dock where strike of longshoremen prevailed, running of lay days held not postponed by strike.**

Under charter party requiring cargo to be taken from alongside vessel as quickly as vessel can deliver, but in no case at less than 1,000 tons daily, not providing for any allowance, in

ascertaining demurrage, for time lost in discharging on account of strikes, *held*, that running of lay days was not postponed by strike of harbor stevedores and longshoremen affecting only a portion of the discharging area of the port, notwithstanding provisions mutually excepting strikes, where delay was due to consignee's sending of vessels to dock where strike prevailed.

**8. Shipping ⬦184—Burden of proving that shipowners could have mitigated loss from delay in discharging cargo caused by strike held on consignee.**

Burden of proving that shipowners could have prevented or mitigated loss arising from demurrage for delay in discharging cargo caused by strike of longshoremen and stevedores *held* on consignee.

**9. Shipping ⬦183—Shipowners' obligation to minimize loss from demurrage does not arise until lay days have expired or contract has been repudiated.**

Shipowners' obligation to minimize loss from demurrage does not arise until after lay days have expired or until contract has been repudiated.

**10. Shipping ⬦177(5)—Under charter requiring cargo to be taken from alongside, shipowner is entitled to recover expense arising on consignee's failure to supply men and appliances to take delivery.**

If shipowner is put to expense by consignee's failure to supply men and appliances to take delivery from alongside of vessel, where charter provides cargo is to be taken from alongside, shipowner is entitled to recover it from charterer.

**11. Shipping ⬦177(2)—Consignee held liable to shipowners for expense of lightening vessel sufficiently to enable it to reach berth safely afloat.**

Though, under charter providing for payment by steamer of all port charges and stevedoring expenses at port of loading and discharging, shipowners could not in any event recover any such expenses, they were entitled to expense of lightening vessel sufficiently to enable it to reach berth always safely afloat, under provision that cargo shall be received by consignee alongside where steamer can discharge safely afloat.

**12. Shipping ⬦183—Consignee held liable for reasonable expenses incurred by ship with consignee's consent before lay days expired, not exceeding demurrage saved.**

Under charter providing that cargo shall be received alongside steamer, where she can discharge safely afloat within reach of her tackles, and that expense of overtime and wharfage and lighterage shall be at expense of cargo, *held*, that shipowners were entitled to recover expenses reasonably incurred with consignee's consent before lay days expired, including lighterage and demurrage of lighter, labor in receiving coal in lighters and discharging lighters, and extra expenses of stevedores and others working overtime, to the extent that such expenses were not more than demurrage saved.

**13. Shipping ⬦184—Consignee held not to have sustained burden of proving release of ship's claim for demurrage and expenses incurred in discharging cargo.**

Consignee *held* not to have sustained burden on it of proving release of ship's claim for demurrage and expenses incurred in discharging cargo.

**14. Admiralty ⬦50—Charterer having been properly impleaded by shipowner, admiralty court may determine charterer's liability for demurrage and expenses of discharging cargo (admiralty rule 56).**

Where charterer was properly impleaded under admiralty rule 56, by shipowners suing consignee for demurrage and expenses incurred in discharging cargo, admiralty court may determine charterer's liability to shipowners as well as consignee's liability.

**15. Shipping ⬦173—Cesser clause held not to relieve charterer of liability for demurrage at loading port before bills of lading signed, but to relieve it of obligations thereafter.**

Cesser clause in charter party, providing that charterer's liability shall terminate as soon as cargo is loaded and freight paid, and giving steamer lien on cargo for freight, demurrage, and all sums becoming due under contract of affreightment, does not relieve charterer from liability for demurrage sustained at loading port before bills of lading were signed, but did relieve charterer from all obligations to shipowners after bills of lading were signed.

**16. Shipping ⬦173—Principle that cesser clause does not exonerate charterer, unless commensurate remedy is given, does not apply where liens were given shipowners with remedies commensurate to those surrendered.**

The principle that cesser clause will not exonerate charterer, unless another commensurate remedy is given by charterer, as by lien on goods which would otherwise not exist, because it will not be presumed that shipowner intended to release his rights against charterer without adequate consideration, does not apply where liens were given to shipowners with remedies commensurate with those surrendered by cesser clause.

**17. Admiralty ⬦10—Admiralty court cannot take cognizance of nonmaritime agreements.**

A court of admiralty has no jurisdiction to determine matters of a nonmaritime nature, and it cannot take cognizance of agreements not in themselves maritime.

**18. Admiralty ⬦12—Whether charterer sold coal to be shipped in vessels sailing 10 days apart, and to be landed at docks, does not involve maritime question.**

Whether charterer sold coal to consignee to be shipped in vessels sailing 10 days apart, and to be landed on docks of port of discharge, does not involve maritime question, but involves a question which charterer has a right to have determined in an action at law.

**19. Admiralty ⬦1—Admiralty court cannot retain jurisdiction to dispose of nonmaritime subjects, to do complete justice.**

A court of admiralty cannot retain jurisdiction to dispose of nonmaritime subjects, for

the purpose of doing complete justice after the manner of courts of equity.

**20. Admiralty ⊚➞12—Whether charterer's assets were fraudulently transferred, and whether transferee was liable for charterer's debts, held not to involve maritime relations (admiralty rule 56).**

Questions whether assets of charterer impleaded under admiralty rule 56 in shipowners' suit for demurrage and expenses in discharging cargo were fraudulently transferred to another corporation, and whether transferee is original corporation in disguise, and for that reason liable for its debts, do not involve any maritime relations, and are peculiarly cognizable by a court or equity or a court of law.

In Admiralty. Libel by Yone Suzuki & Co. and others against the Central Argentine Railway, Limited, in which the Gano Moore Company and another were impleaded. Decree for libelants against the Central Argentine Railway, Limited, and against the Gano Moore Company.

Hunt, Hill & Betts and George C. Sprague, all of New York City, for libelants Suzuki & Co.

Burlingham, Veeder, Masten & Fearey and John G. Galey, all of New York City, for libelants Nederlandsche Amerikaansche, Stoomvaarts Maatschappij, and Green Star Steamship Co.

Carter, Carter & Phillips and Robert Phillips, all of New York City, for libelant Luckenbach Steamship Co.

Kirlin, Woolsey, Campbell, Hickox & Keating and E. S. Murphy, all of New York City, for respondent Central Argentine Ry., Limited.

Walter A. Hill, of St. Louis, Mo., and Richard Townsend, of New York City, for respondent Gano Moore Coal Mining Co.

BONDY, District Judge. Four libels against the Central Argentine Railway, Limited, for demurrage and expenses incurred in discharging coal at Buenos Aires, were consolidated and tried together.

The Central Argentine Railway Company bought coal c. i. f. from Gano Moore Company. Thereafter Gano Moore Company entered into a charter party with each libelant for the transportation of the coal from Hampton Roads to Buenos Aires. Each charter party contained a cesser clause, providing that the liability of the charterer should terminate as soon as the cargo is loaded and the freight paid, and that the steamer should have a lien upon the cargo for all freight, demurrage, and all sums of money which may become due the steamer under the contract of affreightment.

In the case of each shipment there was issued to Gano Moore Company a bill of lading providing for the delivery of the coal to order or assigns, he or they paying freight for the same as per charter party, all the terms and exceptions of which were incorporated by reference in the bills of lading. Gano Moore Company paid the freight, and upon payment for the coal indorsed and transferred the bills of lading to the railway company, which on the arrival of the ships at Buenos Aires directed and accepted delivery thereof.

The railway company contends that, all the terms and exceptions of the charter parties having been incorporated in the bills of lading, the provisions of the cesser clause inured to the benefit of the railway company, as assignee of Gano Moore Company, and that the railway company, therefore, is free from all liability for demurrage. It bases its contention upon the opinion of the federal Court of Appeals of the City of Buenos Aires in The Moncalieri, 1924 A. M. C. 1012, in which the court stated that the cesser clause implies an agreement to exclude all personal action against the shipper or his assignees, they succeeding to all the shipper's rights, and that in any case the libelants failed to prove that the railway company had not supplied sufficient cars for the coal, and failed to prove that the ship had the necessary equipment to permit her discharge at the charter rate.

Witnesses for libelants, well qualified as experts, testified that, notwithstanding that opinion, under the Argentine law an indorsee of a bill of lading incorporating the terms of a charter party containing a cesser clause does not become entitled to the exemption from personal liability granted to the charterer; that the cesser clause applies only to the liability of the charterer, and has nothing whatsoever to do with the obligation of the receiver of the cargo under the bill of lading; and that the fact that under the Argentine law the master cannot retain possession of the cargo, even in cases in which a lien for demurrage has been given by contract, does not affect the receiver's liability in personam for freight or demurrage.

They also testified that what the court said about the cesser clause was obiter dictum, that Argentine is a code country, that its Constitution and Codes constitute its law, and that the decisions of its courts do not constitute any part of its law, and are not binding as precedents on any court.

There is no reason to believe that any other appellate court in the Argentine will consider itself bound by an opinion rendered without

the citation of any authority, and so contrary to the evident intention of the parties and to the interpretation of the cesser clause by the courts of the leading mercantile countries.

[1] Under the circumstances, I find that the court did not correctly interpret the meaning of the cesser clause, and that the Argentine law is the same as the law of the United States and England; that is, that an indorsee of a bill of lading incorporating the provisions of the charter party has the benefit only of those provisions of the charter which relate to the cargo, and therefore cannot resort to a cesser clause in the charter party to avoid liability for demurrage. See Yone Suzuki v. Central Argentine Railway Co. (D. C.) 275 F. 54; Taylor v. Fall River Ironworks (D. C.) 124 F. 826; Scrutton on Charter Parties and Bills of Lading (12th Ed.) p. 67; Carver's Carriage by Sea (7th Ed.) §§ 160, 607, 651.

It follows that the railway company is not relieved by the cesser clause from liability for demurrage, whether its rights be determined under the laws of the United States, where the charter parties were entered into, the bills of lading transferred, and the title to the coal passed to the respondent, or under the laws of the Argentine Republic, where the cargoes were delivered.

[2] The respondent contends that the ships did not have any lien on the cargoes in Buenos Aires, and that they therefore did not surrender anything as a consideration on which to base an implied promise by the railway company to pay demurrage. See Yone Suzuki v. Argentine Ry. Co. (D. C.) 275 F. 54. This contention is based on section 958 of the Argentine Commercial Code, which provides that the master cannot retain goods on board as security against freight.

Section 200 of the Argentine Commercial Code expressly provides that transported goods shall be bound for the payment of freight, expenses, and dues incurred in transportation.

Sections 958 and 1083 provide that the master is entitled to demand from the freighters, owners, or consignees the unloading of the vessel and the payment of freight and expenses on the termination of the time for unloading, and that, if difficulties arise over the discharge, the judge may authorize the deposit of the goods, subject to the right of the shipowner over them, or to demand at the time of delivery of the cargo that they deposit or give security for the amount of the freight and expenses, and in default thereof the master can apply for the arrest

of the shipped goods while they are in control of the owners or consignees. See, also, Argentine Civil Code, §§ 558, 559, 908, 920.

Argentine lawyers testified that the above sections make the consignee liable in personam for the obligations laid upon the cargo in the charter party for demurrage, lighterage, and other expenses incurred in transportation, and that the surrender of the lien does not prevent the person holding both the right to the lien and the right in personam from exercising his right in personam.

The Argentine laws, not only recognize the lien, but expressly provide remedies to enforce rights given by reason of the lien, and expressly impose a liability in personam on the consignee.

The coal was owned by and carried for the benefit of the railway company. It directed and accepted delivery under bills of lading which incorporated the terms of charter parties expressly giving the steamers a lien upon the cargoes for demurrage and all sums which may become due the steamers under the contract of affreightment, and the libelants delivered the coal without asserting their right to apply for the embargo of the coal or to demand a deposit thereof. The court, therefore, finds that the railway company impliedly promised to pay and is liable for the demurrage. See Neilsen v. Jesup (D. C.) 30 F. 138; The Hams Maersk (C. C. A.) 266 F. 806; Taylor v. Fall River Ironworks (D. C.) 124 F. 826; Yone Suzuki v. Central Argentine Ry. Co. (D. C.) 275 F. 54; Carver's Carriage by Sea, §§ 603, 637, 639, 677; Scrutton on Charter Parties, arts. 134, 135.

[3] The charter parties provide that the owners agree to freight from Hampton Roads to Buenos Aires, or as near thereunto as the steamer may safely get and always lie afloat, and there deliver the full and complete cargo of coal, and that the lay days for loading shall commence from the time the steamer is ready to load, and the master has given notice in writing of such readiness, and that lay days for discharging shall commence 24 hours after arrival at or off discharging port, whether steamer is in berth or not, cargo to be taken from alongside by the consignee named in the bill of lading at port of discharge as quickly as steamer can deliver, but in no case at less than 1,000 tons per running days, Sundays and holidays excepted, unless used, and that the cargo shall be received and delivered alongside the steamer, where she can load and discharge always safely afloat within reach of her tackles, and that the steamer shall be dis-

charged at such wharf as the charterer or its agent may designate where steamer may always lie afloat.

At the time that the ships reached Buenos Aires roads the water in the channel leading to the basins and docks, on account of the direction of the wind, was so low that they could not proceed through the channel.

The libelants contend, that when the vessels anchored at Buenos Aires roads, they were "at or off" the port of Buenos Aires, within the meaning of the charter, so as to fix the beginning of lay days.

The respondents contend that the vessels had not yet arrived at or off their discharging port when they reached the roads, and that lay days did not begin to run until 24 hours after they reached a point in the south basin of Buenos Aires, immediately opposite the entrance of the south dock, designated for the discharge by the railway company.

The Buenos Aires roads, a depression in the bed of the River Plate, lie at the beginning of a dredged channel, about 37 kilometers in length, leading to the basins and docks of the city. The channel divides into a north and south channel, about 5 miles from the water front of Buenos Aires. The north channel opens into the north basin, and the south channel into the south basin and south dock, of Buenos Aires.

These roads were formerly the only harbor which Buenos Aires had. The channels, basins, and docks are artificial. They were constructed to make it possible for vessels to discharge nearer the city.

Port regulations, printed in various languages, include the roads, as well as channels, basins, and docks, as part of the port and the roads are understood by shipping men to be a part of the port.

All vessels are required to anchor in the roads, the only anchorage at Buenos Aires for vessels like those of libelants. There vessels discharge their river pilot and take on a pilot to conduct them through the channels to the docks. When vessels anchor in the roads, they come under the jurisdiction of the port authorities. Quarantine and customs examinations are made in the roads. Masters go ashore when they reach the roads to present their notices of arrival, deposit their manifests, enter their vessels, and await designation of berths and permits to go to designated berths.

No vessel can proceed beyond the roads without a permit. No permit is granted till an immediately available berth is designated. There is no stopping place between the roads and berths under ordinary circumstances. The roads are the place where vessels waiting for a berth usually lie. The time when the vessels arrived at the roads, therefore, must determine the beginning of lay days, unless it was intended that they should not begin until after a vessel was actually in, or at least off, its berth.

Disinterested witnesses, familiar with conditions at Buenos Aires, testified that a vessel is at or off the port of Buenos Aires when she drops her anchor in the outer roads, which are within the limits of the port as defined by the port regulations, whether or not the vessel is in a position to discharge her cargo.

In original answers the railway company admitted: "The Yseldyk arrived at Buenos Aires roads, which is at or off the port of Buenos Aires, on April 3, 1920, at 4 p. m.," and "the Seifuku Maru arrived at Buenos Aires roads at 11 p. m. April 14, 1920," and "lay days for the vessel to discharge began on April 15, at 11 p. m. (24 hours after arriving at the discharging berth)."

The masters of the ships actually gave notice of arrival when the ships reached the roads, and they claimed lay days were to be determined by the time of such arrival.

Although the charters expressly make the lay days for loading dependent on the steamers' readiness to load, the lay days for discharging are not made dependent on the ships' readiness to discharge at or off their berths, but on their arrival at or off the discharging port.

It cannot be assumed that the parties intended to give the words "port" and "berth" exactly the same significance, when used together in the provision that lay days shall commence 24 hours after arrival at or off discharging port, whether steamer is in berth or not.

It may also be noted that the charters provide for the carriage of the cargo to Buenos Aires, or as near thereunto as the ships may safely get and always lie afloat, but make the beginning of lay days dependent, not upon arrival at Buenos Aires, or the port of Buenos Aires, but upon arrival at or off the port of Buenos Aires.

These provisions are in effect the same as those in The Marpesia (C. C. A.) 292 F. 957, in which the charter party expressly provided for the carriage of the coal from Norfolk or Newport News, Va., to Buenos Aires, but that lay days were to commence 24 hours after vessels arrived at Buenos Aires roads.

The provision making it possible for lay days to begin 24 hours after arrival off the discharging port, and the provision that the cargo is to be taken from alongside at port of discharge, preclude the contention that the ship must be ready to discharge before lay days can commence.

In this respect these suits differ from Tweedie Trading Co. v. Pitch Pine Lumber Co. (D. C.) 156 F. 88, cited by respondent, in which Judge Hough, construing a charter providing for the carriage of a cargo to Buenos Aires and providing that the ship is entitled to commence discharging immediately upon arrival, said: " 'Arrival' must mean arrival at a place where discharge is possible."

As was said by the court in W. K. Niver Coal Co. v. Cheronea S. S. Co. (C. C. A.) 142 F. 402, 408, 5 L. R. A. (N. S.) 126: "But the critical expression at bar affects only the demurrage, and not the place of discharge. In this respect it is precisely the same in its nature as though the charter stipulated that lay days should count from the time the vessel cast anchor, or, as the parties might have agreed, from the time she arrived at quarantine."

Although the question presented is not free from difficulties, I find that the ships had arrived at or off the port of Buenos Aires when they reached the roads, and that lay days began 24 hours after they arrived at the roads, and were not extended during the time that low water, due to the direction of the wind, prevented them from reaching a place at or off the designated berths, notwithstanding the roads were 37 kilometers from the basins and docks of the city. See Edward T. Stotesbury (C. C. A.) 187 F. 111; Roney v. Chase, Talbot & Co. (C. C. A.) 161 F. 309; The Lake Yelverton (C. C. A.) 300 F. 47; Kokusai Kisen Kabushiki Kaisha v. Flack & Son, 10 Lloyd's List Law Reports, 635, 637; Sailing Ship Garston Company v. Hickie, 15 Q. B. D. 580; Rolandts v. Harrison, 9 Ex. 45, 156 English Reprint, 189; Nielson v. Wait, 16 Q. B. D. 67.

This is not inconsistent with the decision (19 F.[2d] 665, 1924 A. M. C. 570) overruling exceptions to the allegation that it was a general custom of the port of Buenos Aires and the commercial practice there prevailing that a vessel was not an arrived vessel at her discharging port until it had reached its berth in the dock designated by consignee, and that a vessel ordered to discharge at dock sud, south basin, was not arrived at her discharging port until she had reached a point in the south basin immediately opposite to the entrance of the dock sud, and that lay days did not begin until 24 hours after the vessel had reached a point in the south basin immediately opposite dock sud. It merely passed on a question of pleading, and not on the effect of evidence offered in support thereof.

[4] The charters provide that the cargo shall be taken from alongside by the consignee named in the bill of lading at port of discharge, as quickly as steamer can deliver, but in no case at less than 1,000 tons per running day.

The respondent contends that this does not mean that the consignee must receive at the rate of 1,000 tons per day, but that the railway company's obligation was only to receive the cargo as tendered, and that therefore the lays days were not to be ascertained by dividing the quantity of the cargo carried by each vessel by 1,000, but were regulated by the rate at which the vessels actually tendered their cargoes to the railway, and that the burden of proof of tender was on the libelants.

In amended answers the railway company expressly admits that the lay days for the discharge of the Yseldyk under the terms of the charter were 6 days and 9 hours, and for the discharge of the Plymouth 6 days 23 hours and 3 minutes, and in an answer it expressly admits that by the terms of the charter party respondent was allowed 8 days and 8 hours lay days for discharging the Edenton.

These figures were arrived at by dividing the quantity of the cargo on each vessel by 1,000.

In original answers the railway company admitted the allegation of the libel that the rate of discharge of the Seifuku Maru according to charter party was 1,000 tons per day, and that, as there were 6,539 tons of cargo on board, the lay days consisted of 6 days and 13 hours, and also admitted the allegation of the libel that the rate at which the cargo of the Kofuku Maru was to be discharged according to the charter party was 1,000 tons per day; that, as there were 6,406.5 tons of cargo on board, the lay days consisted of 6 days and 10 hours. In the answers to amended libels the railway company does not deny these allegations, but only denies knowledge or information sufficient to form any belief with reference thereto.

In spite of its construction of the charter parties, as disclosed by its answers, the respondent relies for the contention it is now making on Dobell v. Watts, Ward & Co., 7

T. L. R. 622, in which the charter provided: "Cargo * * * to be received from alongside ship at port of discharge, as customary, as fast as steamer can deliver in ordinary working hours, Sundays always excepted, loading or discharging. Not less than 100 standards a day loading or discharging, and 10 days on demurrage over and above the said laying days at £70 per day." The court held the words "not less than 100 standards a day" were inserted for the benefit of the charterer, and that their effect was to make it obligatory on the ship to deliver not less than 100 standards a day, the interests of the shipowner as to the rate of discharge being amply protected by the terms of the clause which imposed on the cargo owner the duty of receiving as fast as the vessel could deliver.

In the cases under consideration, the words "cargo to be taken from alongside by the consignee as quickly as steamer can deliver, but in no case at less than 1,000 tons per running day," expressly impose on the consignee the obligation to take not less than 1,000 tons per day. That it was the intention that the number of lay days should be determined at that rate is further evidenced by the fact that the provision containing those words is entitled, "Lay days for discharging shall be as follows."

In The Corvus (D. C.) 282 F. 939, affirmed (C. C. A.) 288 F. 973, the charter, like those under consideration, provided that cargo shall be taken from alongside by the consignee named in the bill of lading at the port of discharge as quickly as steamer can deliver, but in no case less than 800 tons (2,240 pounds each) per working day. Although the court in its opinion referred to Dobell v. Watts, Ward & Co., relied on by the railway company for its contention, it held that the discharge at the rate of 800 tons a day did determine when the lay days ended, and did determine the amount of dispatch money to which consignee became entitled.

That Judge Learned Hand construed the clause under consideration in the same manner is evident from his statement: "But in the case at bar the charter reads not so, but makes the demurrage rate apply indefinitely after the lay days expire, which are themselves to be calculated on a minimum speed of loading." Yone Suzuki v. Central Argentine Ry. Co. (D. C.) 275 F. 54, 56.

[5] The burden to prove what, if any, delay was due to the fault of the ships was on the railway company. The Hans Maersk (C. C. A.) 266 F. 806. It did not prove that any fault on the part of the ship in tendering the cargo caused the great delay in the discharge. On the other hand, there is evidence that the ships had the equipment to discharge at the rate of 1,000 tons a day, and that much delay was caused by respondent's inability to supply lighters, cars or other facilities to receive the coal.

[6] As Judge Learned Hand held in Yone Suzuki v. Central Argentine Ry. Co. (D. C.) 275 F. 54, the railway company is liable for the demurrage incurred by the Seifuku Maru and Kofuku Maru at the loading port, the charters having imposed liens on the cargoes for demurrage and all sums of money which may become due the steamers under the contracts of affreightment.

[7] The running of lay days of the Edenton and the Plymouth was not postponed by a strike of harbor stevedores and longshoremen affecting only the south dock or coal discharging area at Buenos Aires, notwithstanding the provision of the charters mutually excepting strikes. There was not any general strike of harbor stevedores at Buenos Aires. The strike was confined to the south dock. Some ships actually were discharged in the south basin during the time of the strike. The vessels could have been discharged into lighters in the north basin.

In the clause immediately following the provision excepting strikes, the charter provides that any time lost at docks through strikes that occasion a stoppage of delivery of coal to said steamer is not to be computed as part of the loading time. On the other hand, the next clause, which relates to demurrage at the discharging port, does not provide for any allowance for time lost in discharging on account of strikes. It provides that the cargo shall be taken from alongside as quickly as steamer can deliver, but in no case at less than 1,000 tons for running days.

Had it been the intention that the general strike exception should apply to lay days, the express exception of strikes in the case of lay days for loading would not have been necessary, and the charter would not have contained the inconsistent provision that the cargo in no case was to be taken by the consignee at port of discharge at less than 1,000 tons each day.

The delay at the south dock before the discharging began was due to the unreasonable conduct of the railway company in sending the vessels to a dock where the strike prevailed at the time of designation. See Evans v. Blair (C. C. A.) 114 F. 616, 618.

[8] The respondent contends that the claims

of the Edenton and Kofuku Maru for demurrage are without merit, because they did not make any effort to mitigate damages.

As was stated in United States v. Sugarland Industries et al. (C. C. A.) 296 F. 913: "The appellant is not entitled to recover the amount of demurrage claimed, if it was entirely practicable for it to obviate any delay beyond the lay days by incurring and charging against appellees an expense substantially less than the amount of demurrage claimed for the avoidable delay."

There is no proof that it, was practicable, or even possible, for the libelants to have done anything other than they did to obviate delay. If the railway company could not supply the necessary facilities to receive the coal, because the vessels arrived so soon after one another, it is not apparent what the libelants could have done to minimize damage, with the same difficulties confronting them as confronted the railway company. Under such circumstances the burden of proving that the libelants could have prevented or mitigated loss was on the respondents. Lillard v. Kentucky Dist. & Warehouse Co. (C. C. A.) 134 F. 168, 178; Cornwall v. J. J. Moore & Co. (D. C.) 132 F. 868, 870, affirmed (C. C. A.) 144 F. 22.

[9] Although this obligation to minimize does not arise until after the lay days have expired, or until the contract has been repudiated (Cornwall v. J. J. Moore & Co. [D. C.] 132 F. 868, 870, affirmed [C. C. A.] 144 F. 22; Stoomvart Maatschaffy Nederlandsche Lloyd v. Lind [C. C. A.] 170 F. 918, 920; Steger v. Orth [C. C. A.] 258 F. 619, 623), it does not follow that the libelants may not recover the expenses reasonably incurred before the expiration of the lay days. In United States v. Sugarland Industries, supra, the Supreme Court said: "If the carrier had discharged the cargo at the agreed rate and the consignees had failed to receive it, the carrier could have had it moved to a place of safety and charged the consignees with the expense of so doing."

[10] If the shipowner is put to expense in consequence of the failure of the merchant to supply the men and appliances to take delivery from alongside when the charter provides the cargo is to be taken from alongside, he is entitled to recover it from the charterer. See Carver on Carriage of Goods by Sea, §§ 463, 612b; Dahl v. Nelson, 6 App. Cas. 38.

[11] The charter provides for the payment of all port charges and stevedoring expenses at the port of loading and discharging by the steamer. The libelants, therefore, can not recover any such expenses in any case. They, however, are entitled to the expense incurred to lighten the Yseldyk and the Seifuku Maru sufficiently to enable them to reach their berths, always safely afloat. See Mencke v. Cargo of Java Sugar, 187 U. S. 248, 23 S. Ct. 86, 47 L. Ed. 163.

[12] Besides being entitled to the expenses incurred after the expiration of the lay days by reason of the failure of the respondents to provide the necessary facilities for receiving the coal at the contract rate of discharge, the libelants are entitled to the payment of the expenses incurred with the consent and acquiescence of the railway company before the lay days expired, including lighterage and demurrage of lighters, labor in receiving coal in lighters and in discharging lighters, and the extra expenses of stevedores and winchmen working overtime, Sundays, and holidays, and expense of working equipment ashore in receiving coal, to the extent that the same were reasonably incurred and were not more than the demurrage saved thereby. See Cazalet v. Morris, 18 S. C. (5th Series) 952. This is especially so because the charters provide that the cargoes shall be received alongside the steamer where she can load and discharge always safely afloat within reach of her tackles, and that the expense of any overtime incurred by reason of steamer working on Sundays and holidays to be on account of parties of second part, and that wharfage and lighterage and extra lighterage, if any, shall be at the expense of the cargo.

[13] The Plymouth stopped discharging and left Buenos Aires with 93 tons of coal which belonged to the respondent in' her hold. There is no evidence that the owner of the Plymouth, or any one else, having authority so to do, released or intended to release the claim of the owner for demurrage or expenses incurred in discharging, or that any consideration was given for any such release. The 93 tons of coal were bought and paid for by the Plymouth. This fact is inconsistent with respondent's contention that the respondent's consent that the Plymouth depart without discharging the coal constituted the consideration for such release, or for an accord and satisfaction. In any case, the respondent has failed to sustain the burden of proving a release, or an accord and satisfaction.

[14] Gano Moore Company has been properly impleaded by the Central Argentine Railway Company under admiralty rule 56, though there was no maritime obligation between the railway company and Gano Moore

Company, and this court may determine the liability of Gano Moore Company, as well as the Central Argentine Railway Company, to the libelants. Luckenbach S. S. Co. v. Central Argentine Ry. Co. (D. C.) 298 F. 344. [15] "The cesser clause does not say, nor does it mean, that the liabilities of the charterer which have accrued prior to the signing of bills of lading are to be extinguished, but only that the charterer is to be relieved from such charter obligations as arise after the bills of lading have been signed." · The Marpesia (C. C. A.) 292 F. 957. Gano Moore Company, therefore, remained liable for demurrage sustained at the loading port by the Seifuku Maru and Kofuku Maru.

The cesser clause, however, released Gano Moore Company from all obligations to the libelants after the bills of lading were signed. The Hans Maersk (C. C. A.) 266 F. 806; The Marpesia (C. C. A.) 292 F. 957; Luckenbach v. Central Argentine Ry. Co. (D. C.) 298 F. 344.

[16] Relying on Crossman v. Burrill, 179 U. S. 100, 21 S. Ct. 38, 45 L. Ed. 106, and Dewar v. Mowinckel (C. C. A.) 179 F. 355, 362, and the principle that the cesser clause is to be construed as inapplicable to a liability with which the lien is not commensurate, the railway company contends that the laws of Argentine prohibit a ship from retaining possession of the cargo, that therefore the lien conferred by the cesser clause was not commensurate with the charterer's liability, and that the cesser clause accordingly did not release Gano Moore Company from liability for demurrage. In neither of these two cases was the lien given the shipowners on the cargo by the cesser clause preserved against the indorsee of the bills of lading by incorporation of the lien provision in the bills of lading.

As has heretofore been stated, the Argentine laws not only recognize a lien on transported goods, but they provide remedies and impose on the consignee a liability in personam for demurrage fully commensurate with the liability of the charterer. To hold the charterer liable, notwithstanding the liability imposed on the railway company by the laws of Argentine, would violate the intention of the charterer and the shipowner, expressed in the cesser clause, relieving the charterer from all liability. The principle that the cesser clause will not exonerate the charterer, unless another commensurate remedy is given by the charter, as by a lien upon the goods which would otherwise not exist, because it will not be presumed that the shipowner intended to relinquish his rights against the charterer without adequate consideration (see Carver, §§ 607, 649, 650), does not apply because liens were given to libelants and the libelants did possess remedies commensurate with those surrendered by the cesser clause.

The contention of the railway company that the cesser clause did not release Gano Moore Company is also inconsistent with its contention that the cesser clause did release Gano Moore Company, and that the railway company, as the assignee of Gano Moore Company, had the benefit of the release of Gano Moore Company.

[17] A court of admiralty has no jurisdiction to determine matters of a nonmaritime nature. It therefore cannot take cognizance of agreements not in themselves maritime. [18] Whether or not Gano Moore Company sold the coal to the railway company to be shipped in vessels sailing 10 days apart, and to be landed on the docks in Buenos Aires, does not involve a maritime question. It involves a question which Gano Moore Company has a right to have determined in an action at law. Aktieselskabet Fido v. Lloyd Braziliero (C. C. A.) 283 F. 62; The Goyaz (D. C.) 281 F. 259.

[19] Nor can a court of admiralty retain jurisdiction to dispose of nonmaritime subjects for the purpose of doing complete justice after the manner of courts of equity. The Wabash (D. C.) 296 F. 559.

[20] Gano Moore Coal-Mining Company, Inc., was not organized until 1922, and not until after the charter parties were entered into by Gano Moore Company. The questions whether or not the assets of Gano Moore Company, do not involve any mariferred to Gano Moore Coal-Mining Company, Inc., and whether or not Gano Moore Coal-Mining Company, Inc., is Gano Moore Company in disguise, and whether for that or any other reason Gano Moore Coal-Mining Co., Inc., is liable for the debts of Gano Moore Company were fraudulently transtime relations, and are questions which are peculiarly cognizable by a court of equity or a court of law. These suits are distinguishable from those referred to by the respondent, in which there was no controversy as to any of the material facts establishing one corporation to have been a dummy for another at or before the time liability arose

The libelants, therefore, are entitled to a decree against the railway company and Gano Moore Company for the demurrage sustained by the Kofuku Maru and Seifuku Maru at the loading port, and against the Central Argentine Railway Company for de-

murrage and extra expenses incurred by all the vessels at the discharging port, in accordance herewith, the amount thereof to be computed by a commissioner.