### VANE et al. v. A. M. WOOD & CO., Inc., et al.

(District Court, S. D. New York. February 15, 1916.)

1. SHIPPING ⚯150—FREIGHT—LIABILITY OF CONSIGNEE.

A consignee, who receives a cargo under a bill of lading which contains an agreement that he shall pay the freight, becomes personally liable therefor; but his liability is limited to the amount for which the ship has a lien, and where under a charter the ship is to be paid a per diem freight he is liable therefor only up to the time when his goods are discharged.

[Ed. Note.—For other cases, see Shipping, Cent. Dig. §§ 225, 226, 511; Dec. Dig. ⚯150.]

2. SHIPPING ⚯147—FREIGHT—LIABILITY OF SHIPPER.

A shipper, whose contract is with a charterer, and who had no knowledge of the charter and did not receive the bill of lading, which referred thereto, is not liable for freight in accordance with its terms; but the extent of his liability is determined by his own contract with the charterer.

[Ed. Note.—For other cases, see Shipping, Cent. Dig. §§ 500, 506, 507; Dec. Dig. ⚯147.]

In Admiralty. Suit by William B. Vane and others against A. M. Wood & Co., Incorporated, and the American Smelting & Refining Company. Decree for libelants.

This is a libel in personam for the recovery of freight upon a voyage of the schooner Fannie H. Stewart, of Cambridge, Md., from Baltimore to Perth Amboy and back to Chesapeake Bay. The libelants chartered the vessel to

---

⚯For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

one Anthony McGarvey for the voyage in question, to carry a complete cargo of pyrites cinders at a hire of $20 per day for every day from the day the vessel reported ready to load cargo in Chesapeake Bay until her return. The vessel reported at the place stated in the charter party on June 6, 1914, and cleared on June 8th with a full cargo of pyrites cinders, which had been shipped by the respondent A. M. Wood & Co., and was consigned to the other respondent, American Smelting & Refining Company. The vessel arrived at Perth Amboy on June 26th and delivered her cargo to the American Smelting & Refining Company, returning to Chesapeake Bay about July 19th. The libelants claim freight for 44 days, $880, together with towing charges of $56, and give credit for $200 paid. The charterer, McGarvey, made a contract with the respondent A. M. Wood & Co. for the carriage of pyrites as referred to, and A. M. Wood & Co. had previously sold the cargo to the American Smelting & Refining Company at "$1.90 per gross ton f. o. b. barge alongside dock, your works, Perth Amboy." When the cargo came on board the Fannie H. Stewart, the master, Clyde Elliott, issued a bill of lading in usual form, with the following clause: "To be delivered in like good order and condition at aforesaid port, Perth Amboy, N. J., * * * unto American Smelting & Refining Company, or assigns; he or they paying the freight for the said goods at the rate of freight and all conditions as per charter party." This bill of lading was given by the master to the American Smelting & Refining Company after the ship reached Perth Amboy. The company received it and thereafter directed the loading to proceed. This was on the 26th of June. After the cargo was partly unladen, the captain, Elliott, demanded his freight, whereat the American Smelting & Refining Company communicated with A. M. Wood & Co., who thereupon paid the amount of freight due to McGarvey under their contract of carriage with him, which amounted to about $400; McGarvey promising to pay the vessel's freight out of the sum thus paid, a promise which he performed only to the extent of the $200 credited by the libelants.

George Whitefield Betts, Jr., of New York City, for libelants.

Chauncey I. Clark, of New York City, for respondent A. M. Wood & Co., Inc.

Cletus Keating, of New York City, for respondent American Smelting & Refining Co.

LEARNED HAND, District Judge (after stating the facts as above). [1] The American Smelting & Refining Company is certainly liable for a certain amount of the freight. It has been held for many years that a consignee, who receives goods under a bill of lading which contains an agreement to pay freight, is personally responsible for the freight. The theory is that the acceptance of the goods under the bill of lading is evidence of an agreement by the consignee to be bound in accordance with its terms. Cock v. Taylor, 13 East, 399; Sanders v. Vanzeller, 4 Q. B. 206; Moeller v. Young, 25 L. J. Q. B. at page 96. The American cases accord, although the reason for the rule is not always stated. Certain Logs of Mahogany, 2 Sumner, 589, Fed. Cas. No. 2,559; Phila. & Reading R. R. v. Barnard, 19 Fed. Cas. 478; Shaw v. Thompson, Fed. Cas. No. 12,726. The rule has, however, been stated as an absolute legal liability. Union Pac. R. R. Co. v. American Smelting & Refining Co., 202 Fed. 720, 121 C. C. A. 182. And this apparently is the effect of the English Bills of Lading Act, 1855 (18 & 19 Vict. c. 111, § 1).

It is not important for this case to decide which doctrine is correct, for there is no question here of the American Smelting & Refining Company's implied undertaking to pay the freight. The real question

at issue is the extent of the obligation. As the charter party was at the rate of $20 per day, and the freight under all the authorities was earned de die in diem, there had been earned only so much as had accrued by the lapse of time up to the 27th of June, together with the towing charges. The rest of the freight was to be earned in the future. There is no doubt, I think, that the master could not have held the cargo under a lien for more than the freight due up to that time. Foster v. Colby, 3 H. & N. 705; Thompson v. Small, 1 C. B. 328; Alsager v. St. Katherine's Docks, 14 M. & W. 794. The question, therefore, depends on whether the implied agreement should be interpreted as commensurate with the lien, or whether it should be interpreted as an absolute agreement to pay the full amount of freight, even though it had not yet been earned at the time of delivery. Justice Story, in Certain Logs of Mahogany, said obiter that the agreement would be implied, even where there was no lien; but it was quite unnecessary for the disposal of that case. He had before him the question of lien, and lien only, the voyage was complete, the charter money was a lump sum down, and had all been earned at the time the lien was asserted. It is true that he held the inward cargo for both outward and inward freight; but it was not necessary for him to dispose of the question which his dictum refers to, and he obviously did not give it the same consideration as the other points which had arisen.

In White & Co. v. Furness, Withey & Co., [1895] A. C. 40, the House of Lords decided, however, that the liability in such a case depends upon the existence of the owners'. That was a case where, under the statute, the consignee had deposited money to pay the lien in the hands of the warehouseman, who acted as stakeholder. A question afterwards arose as to the amount of the freight, and the owner sued the consignee, disregarding the deposit of the lien. The House of Lords held, reversing the Court of Appeal, that, where the consignee under such a bill of lading accepts the goods, the whole transaction is evidence of an undertaking, but that it depends upon the existence of the lien, and since, under the statute, the lien ceased with the deposit, there could be no implied liability. Although this is not binding upon me, it is of the highest authority, especially in matters concerning shipping, and I have been referred to no case which holds to the contrary.

The main importance of importing such an agreement rests in the fact that it enables ships to discharge their cargo without the embarrassment involved in protecting the lien, provided the owners are satisfied with the consignee's solvency. The consideration for the agreement is the release of the lien, and there seems no reason in justice to suppose that the consignee means to agree to pay more than so much as is necessary to release his goods. By paying down the lien at once he could compel the owner to deliver, and could, indeed, sue him for trover if he does not. Foster v. Colby, supra; Thompson v. Small, supra. Why, then, should it be supposed that he intended to pay more than was necessary to release his goods? It seems to me clear that to impose larger liability upon him is not reasonable. I think, therefore, that the liability of the American Smelting & Refining Company ex-

tends to only so much freight as was earned up to the final discharge of the vessel, together with her towing charges up to that time.

[2] The question then arises of the liability of the shipper, A. M. Wood & Co. That the shipper is himself liable for freight when he ships the goods is well settled law, where there is no charter party. Fox v. Young, 40 L. J. Exch. 259. Moreover, this obligation, at least in the absence of a cesser clause, endures after the consignee has accepted delivery, because the clauses in the bill of lading imposing liability upon the consignee are for the protection of the owner, and not of the shipper. Shepard v. De Bernales, 13 East, 565; Donnett v. Beckford, 5 B. & Ad. 521. The question thus arises, however, whether, when the shipper, as here, never received the bill of lading, and when there was a charter party outstanding between a third person and the owner, of which the shipper never had notice, the same law arises.

I see no basis for the construction of any such obligation. In the case of the consignee, as I have already stated, the contract arises from his acceptance of the bill of lading, containing, as it does, an agreement that he shall pay freight, as per the charter party. But the shipper in this case had received no bill of lading and made no such agreement, unless it is to be imported from the mere fact of placing his goods on board the ship. There is good reason for importing such an agreement where he deals only with the ship, and not with the charterer; but in this case he dealt with the charterer, under a specific agreement which limited his obligation by its own terms. I see no reason in such a case to imply any agreement to pay any part of the hire reserved in the charter. Had the shipper actually received the bill of lading, an entirely different situation would have arisen.

The remaining question is whether the American Smelting & Refining Company can throw the loss upon the shipper, A. M. Wood & Co. There seems to be little doubt that in fact A. M. Wood & Co. must, in the final event, bear the loss, for the reason that under the contract between itself and the American Smelting & Refining Company it agreed to deliver the goods f. o. b. Perth Amboy. There is, however, a technical difficulty involved, due to the fact that the American Smelting & Refining Company has not filed any petition against A. M. Wood & Co. for this leave. In order to grant such relief there must be some such petition and demand, and A. M. Wood & Co. must have an opportunity to be heard on that question.

As a result, therefore, the libelants may take a decree against the American Smelting & Refining Company for the sum above stated, and the American Smelting & Refining Company may file a petition against A. M. Wood & Co., which A. M. Wood & Co. will have leave to answer, if so advised. Upon that petition and answer the case will come on again upon the existing proofs and any others which the parties may present for disposition of that petition. It may be, however, that A. M. Wood & Co. will agree that it has no defense against the American Smelting & Refining Company, and will consent that a decree can go against them, in which case the decree will read against

both American Smelting & Refining Company and A. M. Wood & Co., with a direction that process shall issue first against A. M. Wood & Co. and no process against the American Smelting & Refining Company unless on failure of satisfaction.

The libelant may have one bill of costs against both respondents. The payment made by McGarvey to the libelants out of the money which A. M. Wood & Co. paid him may be marshaled against so much of the whole charter hire as was earned on the return trip. It was a payment made by McGarvey without attribution, and gave the owners the right to apply it as they chose.