## UNITED STATES v. ASHCRAFT-WILKINSON CO.

District Court, N. D. Georgia. April 28, 1927.

No. 908.

1. Shipping ⬅️174—Consignee, accepting delivery, is bound for ship's charges, including demurrage.

A consignee purchaser, who accepts delivery from the ship, is bound in personam to the ship for its charges, which were a lien on the cargo, including demurrage, though by the contract of purchase the cargo was to be delivered free of all charges, and the consignee was not bound to accept it until they were paid.

2. Shipping ⬅️106(3)—One accepting cargo without knowing or inquiring as to conditions of bills of lading or charter party takes subject to them.

One who accepts a cargo intended for him, and as to which he knows bills of lading and charter party are outstanding, without obtaining those papers or inquiring of the master touching their contents, takes the risk of what their provisions may turn out to be.

3. Shipping ⬅️106(3)—Bill of lading incorporates charter party by reference for conditions not elsewhere expressed.

Bills of lading, which refer to the charter party for conditions other than those expressed therein, in effect incorporate the charter party.

4. Shipping ⬅️171—Discharge and demurrage rate provisions of charter party held valid and applicable.

Provisions of charter party as to rate of discharge and fixing rate of demurrage held valid and applicable.

5. Shipping ⬅️181(4)—Lay days under charter party held to commence when ship is placed at orders of consignees as to berth, having passed customs.

Under a provision of a charter party, "lay days to commence the day after the steamer has been entered at custom house and is ready to discharge," she is ready when she places herself at orders of consignees as to berth, having passed custom house and performed all preliminaries on her part.

18 F.(2d)—62

6. Shipping ⬅️177(1)—Ship is not entitled to demurrage for delay due to her own fault or defective equipment.

A ship is not entitled to demurrage for delay caused by her own fault, through defective equipment or fault of stevedores, where she is bound to discharge cargo at her own expense.

In Admiralty. Suit by the United States against the Ashcraft-Wilkinson Company. Decree for the United States.

Clint W. Hager, of Atlanta, Ga. (H. F. Birnbaum, of Washington, D. C., and C. P. Goree, of Atlanta, Ga., of counsel), for the United States.

Buist & Buist, of Charleston, S. C., and W. D. Ellis, Jr., of Atlanta, Ga., for respondent.

SIBLEY, District Judge. This is a libel in personam, brought by the United States, as owner of the steamship Vittorio Emmanuele III, against Ashcraft-Wilkinson Company, recipients of the cargo, to collect demurrage for delay in discharging the ship. I find the material facts to be as follows:

In the fall of 1919, Ashcraft-Wilkinson Company contracted to buy of a German syndicate a cargo of fertilizer salts, to be delivered in Savannah, Ga., free of freight, insurance, and other costs. To carry out the sale, J. H. Bachmann, of Bremen, chartered the steamer Vittorio Emmanuele III, under a charter party dated January 27, 1920, exhibited in the libel, and had the fertilizer salts duly loaded upon her. Bills of lading for the cargo were issued by the master about February 10, 1920, by which he engaged to deliver the cargo at Savannah, under certain terms and conditions, unto the order of National City Bank of New York, freight to be paid by consignee at the stated rate, "all other conditions and exemptions as per charter party dated Bremen, January 27, 1920." The ship arrived at Savannah on March 2, 1920, passed quarantine and customs, and moored alongside another vessel, and while so moored, and about 1:50 p. m., gave notice of readiness to deliver. The shipowners had Tresdale, Plant & La Fonta representing them at Savannah, and the charterers had arranged with Strachan Shipping Company to represent them and the cargo.

Because of disturbed communications with Germany subsequent to the war, the bills of lading, with copy of charter party and insurance papers, had not reached Ashcraft-Wilkinson Company. These papers, in fact, were not indorsed over to them by Na-

tional City Bank until March 10th or 11th, and were first seen by them about March 13th. The arrival of the ship, however, was communicated to them at once by Strachan Shipping Company, and Ashcraft-Wilkinson Company arranged with Central of Georgia Railroad Company to receive delivery for them. Ashcraft-Wilkinson Company did not employ or pay Strachan Shipping Company to act for them, and recognized them only as representatives of the sellers of the fertilizers making delivery, though they kept in touch, through them, with the progress of the discharge of the ship, and approved finally all that Strachan Shipping Company had done thereabout. Notice of the berth to be occupied by the ship was given her apparently on the afternoon of March 2d, and at 8 a. m. on March 3d she was alongside the wharf, actually ready to discharge, and discharge was then begun. Smith and Kelly, the only stevedoring firm at Savannah at the time, were employed on the ship, working supposedly from 8 a. m. to 6 p. m., with one hour for dinner, as was customary at the port.

The vessel had five hatches, each equipped with two winches, but it was found impossible, owing to insufficient supply of steam to them, to work more than three hatches at a time, and the stevedores actually employed but two gangs much of the time, and only three at any time. Because the winches worked slowly, the number of men in these gangs was reduced one-third. The different winches, moreover, broke down repeatedly, so that much delay occurred in shifting gangs to other hatches and in suspension of work for winch repairs. No full and reliable record exists of the actual loss of time, but the stevedores' daily record shows a very poor delivery from most of the hatches on most of the days, and the evidence suggests indifference of the master and stevedores. Other delays were occasioned by the failure of the Central of Georgia Railroad Company at times to promptly handle cars away from the wharf. The ship and the stevedores did not refuse, on demand, to work at night, nor did they tender any such work; but Strachan Shipping Company did, on March 8th, attempt to get the Central of Georgia Railroad Company to receive cargo at night, and it declined to do so. The discharge was completed at 1:50 p. m. March 13, 1920. On March 4th work was interrupted by rain, and that is to be counted as a half day only. Saturday, March 7th, was, by custom of the port, a half holiday, and to be counted as only a half working day.

Sunday, March 8th, was not a working day, and is to be excluded.

Though the master had a copy of the charter party, its contents were actually unknown to Ashcraft-Wilkinson Company until the dispute about the demurrage arose. Before the World War fertilizer cargos had usually moved under charter parties of the same general form as that used here, but providing a rate of discharge of only 300 tons daily, and a rate of demurrage of only 8 pence sterling per ton net register, instead of 550 tons discharge, with a rate of $1 per ton net register. The ship Vittorio Emmanuele III was the first, or among the first, ships to bring such a cargo into Savannah after the war, and Ashcraft-Wilkinson Company supposed the provisions as to discharge that were formerly used would apply, and made no inquiry thereabout. They paid the freight, deducting it from the purchase price due sellers on the bills of lading, but refused to pay demurrage. Effort was made by the United States to collect demurrage on a libel against the cargo, but it was held that the lien had been lost by delivery. After fruitless negotiations, this libel in personam was filed March 3, 1923.

The main questions to be decided are: (1) Are respondents liable in personam for demurrage without an express agreement to be bound? (2) If so, are they bound by the provisions of the charter party touching it, and are those provisions enforceable or a mere penalty? (3) If liable, for what time and in what amount?

[1] 1. No express promise to pay demurrage on the part of Ashcraft-Wilkinson Company is alleged or proved. In a letter to Strachan Shipping Company on March 12th, they expressed a willingness to pay fair demurrage; but this is not shown to have been communicated to any representative of the ship, nor to have resulted in any contract thereabout. But an agreement to pay proper demurrage, should any be incurred in discharging, is to be implied on the part of the recipients of the cargo. The shipowner is entitled to protection against the unreasonable detention of the ship, and in this case, as was usual, had stipulated against it, and exacted in the charter party a lien on the cargo for demurrage, as well as for freight. Under it he could have held the cargo, or any part of it, until the charges were paid, or a satisfactory agreement made for payment. The charterer, by the cesser clause, was not personally liable to the ship after loading the cargo. The ship, in delivering the cargo, would lose the benefit of this lien, and the

consignee would receive the benefit of its release.

The fairness, nothing else appearing, of implying an engagement to pay the charges, when delivery is taken in silence, but with knowledge of the situation as outlined, is as evident as when one accepts the valuable goods or services of another without express agreement touching payment. In the present case, Ashcraft-Wilkinson Company were not bound to take the cargo at all until it was delivered free of charges on the wharf, not having, on the arrival of the ship, become a party to the shipment by accepting indorsement of the bills of lading. Since they had bought the goods delivered in Savannah free of freight, insurance, and other charges, they might have refused to have anything to do with them until so delivered. But this right, as against the charterer, would not affect the rights of the ship, for it was no party to the sale of the fertilizers.

When Ashcraft-Wilkinson Company elected to deal with the cargo in the hands of the ship, either by buying the bills of lading or getting delivery without having bought them, the very act of taking the cargo free from the known lien binds them to pay the ship the amount of the lien. 36 Cyc. 349, 356; North German Lloyd v. Heule (D. C.) 44 F. 100, 10 L. R. A. 814. Their recourse is to charge back to the seller of the goods anything which, as between themselves, they should not have been forced to pay. 36 Cyc. 367. This accords with the rule implying a promise to pay freight and demurrage against the consignee accepting delivery from the railroads, even though the consignor of such freight is still bound therefor. Western & Atlantic Railroad v. Underwood (D. C.) 281 F. 891, and cases cited; L. & N. Railroad v. Central Iron Co., 265 U. S. 60, 44 S. Ct. 441, 68 L. Ed. 900; Pittsburgh Railroad Co. v. Fink, 250 U. S. 577, 40 S. Ct. 27, 63 L. Ed. 1151.

[2] 2. Ashcraft-Wilkinson Company were not surprised at being charged with freight and demurrage, but their contention really is that the unknown and unusual provisions of this charter party should not measure the demurrage against them. The hardship in this particular case must not blind us to the importance of fixing a proper commercial rule to govern all cases. The rule must be held to be that one who accepts a cargo intended for him, and as to which he knows bills of lading and charter party are outstanding, without obtaining those papers or inquiring of the master touching their con-

tents, simply takes the risk of what their provisions may turn out to be.

[3] The case has been argued as though Ashcraft-Wilkinson Company had the bills of lading, but were ignorant of the charter party. The bills of lading on their face refer for conditions other than those named in them to a particular charter party of a certain place and date. This reference, under familiar rules, incorporated, in effect, the charter party into the bills. 36 Cyc. 95, note 45. There being no statute fixing the terms of such a paper, it might be such an one as the parties should agree on. That some of its provisions were unusual, or even contrary to custom, would not invalidate it. 36 Cyc. 356. There is no proof of fraudulent intent in making this charter party, or any concealment touching its terms, and no false or misleading recitals in the bills of lading. But in fact Ashcraft-Wilkinson Company had neither bills nor charter party when they arranged to accept the cargo, and did not ask the contents of either. They cannot be held to have been misled by the ship, so as to estop it from asserting its rights under the charter party.

[4] The provisions of the charter party as to the rate of discharge and the measure of demurrage do not seem to me to be void, or to be mere penalties. The former custom as to such, if it amounted to a custom, could not control an express agreement contrary to the custom. The evidence is abundant that a five-hatch ship can very easily discharge 550 tons of such a cargo as this in a day of nine hours, and there is no impossibility shown of receiving it at this rate on the wharf. The demurrage rate, about 12 times as great as before the war, and higher than has since been maintained, seems excessive. It brings to the ship $3,600 per day; more, apparently, than she could expect to earn as freight, and thus putting her under the temptation to delay discharge. But considering the abnormality of the times, and in the absence of any direct testimony as to the negotiations that resulted in the agreement, there does not seem to me to be enough to warrant the holding that it was a mere penalty, and not, as it purports to be, an effort to agree in advance on the damage of delaying the ship, by which, not only a few days' freight, but an entire voyage, might be lost to the ship.

[5] 3. But the severity of the contract justifies a very critical application of it. The charter party provides: "The steamer to be discharged at port of discharge at not less

than an average quantity of 550 tons a weather working day. If detained longer, demurrage to be paid one dollar per ton net register for every day so detained. * * * The steamer is to be discharged at two wharves at her expense, as ordered by consignee, within 24 hours after steamer has been entered at the custom house; consignee guaranteeing sufficient depth of water. * * * Lay days to commence the day after the steamer has been entered at custom house and is ready to discharge." The days mentioned are calendar days of 24 hours each, beginning at midnight. See 36 Cyc. 367, note 17, at end. The lay days are figured by both parties at 5 days and 11 hours. They begin to run the day after the steamer has been entered at the custom house (March 2d) and is *ready to discharge.*

The contention is made that the steamer was not ready to discharge on March 2d, though she claimed to be, because she was not in her berth, but moored alongside another ship. I think the true meaning is that the ship is ready when she places herself at the orders of the consignee as to berth, having passed the custom house and performed all preliminaries on her part. The remainder of that day is allowed for assigning and reaching berth. By midnight her first berth must have been provided, though 24 full hours after entry at the customs house are allowed for orders concerning a second berth. If the steamer has entered her first berth by the beginning of the following day, the lay days then begin. If, after prompt assignment of berth, however, she has not entered it, the fault becoming hers, lay days are tolled until she enters berth.

In this case I hold that lay days would have commenced after midnight of March 2d, but that the evidence indicates that she was not actually in berth before 8 a. m. March 3d, losing thus 8 hours, and transferring the beginning of the lay days from midnight to 8 a. m., March 3d. This seems to have been assumed by the parties in their first calculations. Five days and 11 hours would thus carry them to March 8th, at 7 p. m., and a Sunday, a half holiday, and a half rainy day added to that would extend them 2 days more, to March 10th, at 7 p. m. The ship was actually delayed until March 13th, at 1:50 p. m., apparently 2 days, 18 hours, and 50 minutes over time. The delay, when shown, is prima facie to be compensated under the contract, and the burden is on respondent to show excuse, if any.

[6] It is a good defense pro tanto to show the delay was due, in whole or in part, to the fault of the ship or its agents. 36 Cyc. 360. This includes, of course, fault in the ship's equipment, such as the winches and the steam furnished to them. In stipulating for a rate of 550 tons per day from a five-hatch vessel, she must be understood as undertaking that her equipment will make her hatches available for such discharge. The fault of the stevedores is also to be accounted the fault of the ship, for the plain agreement as to that is: "*The steamer to employ* charterer's and consignee's stevedore for loading, stowing, and *discharging* the cargo; * * * the stevedore to be considered the direct *servant of steamer,* although he is nominated by charters [charterers]. All work pertaining to the loading, stowage and *discharge* of cargo to be done under the direction and supervision of the master, and the *owners* to be fully and in every respect *responsible* for cargo and proper loading, stowage and *discharge.*" It is thus immaterial whether the winches broke down from their own defects or from careless use by the stevedore, or whether other delays were occasioned by insufficient steam or insufficient gangs on the ship, or lack of industry on their part. The failure to fully use substitute equipment, such as swinging booms, was the fault of the ship.

The whole duty of putting the cargo over the ship's side was on the ship, except as prevented by the consignees and their agents. Night work was blocked by the refusal of the railroad company, and the ship is to be excused touching this. The stevedore's record shows that on March 11th, hatch No. 1, though delayed 80 minutes, put out 210 tons that day. The day before 190 tons were put out of it. On March 9th, a single crew put out of hatches Nos. 1 and 2, 188 tons. On March 5th, 252 tons were raised from hatch No. 2, and 183 tons from hatch No. 4. These items show what could be done in a day of 9 hours when men and winches worked. An average output of 184 tons from each of three hatches would have fulfilled the requirements, but the average delivery per hatch was far below this. The failure seems to have been due partly to failure of steam and of the winches, partly to insufficient gangs and to a want of energy in the stevedores, and partly to their knocking off work on several occasions, as appears from their record, instead of transferring to another hatch. For all of these things I think the ship was in fault.

While, owing to lapse of time and absence of full and reliable records, I cannot

precisely determine how much loss of work arose thus on the ship, and how much from the failure of the railroad to receive promptly on the wharf, I am sure that the former was not less than the latter. Substantial justice will be done by dividing this fault, and awarding a decree for demurrage for one-half the overtime; that is, for 1 day 9 hours and 25 minutes.

Whereupon it is considered and decreed that the libelant, the United States of America, do recover of the respondents, Ashcraft-Wilkinson Company, as demurrage due in respect of the matters set forth in the libel, the sum of $5,012.50, with interest at 7 per cent. from March 13, 1920, and $————, its costs in this behalf expended, to be enforced by execution on application therefor.