## UNITED STATES v. AMERICAN SUGAR REFINING CO.

District Court, S. D. New York.   June 20, 1928.

Charles H. Tuttle, U. S. Atty., of New York City (George A. Washington, of New York City, of counsel), for the United States.

Hull, Abbott & Carpenter, of New York City (Joseph F. Abbott, of New York City, of counsel), for respondent.

KNOX, District Judge.   Upon the facts of this case, it is difficult to see how the respondent can escape liability for the demurrage which accrued in favor of the Lake Giltedge when she loaded sugar at Cardenas and Matanzas, Cuba, which was subsequently delivered to respondent as the holder of bills of lading issued at the time the cargo went on board the vessel.   All of the bills contained this clause, to wit:

"This bill of lading is subject to all provisions of the charter party or freight contract dated ———, under which this shipment is made, and is without prejudice thereto."

The shipping documents, issued at Cardenas (three in number), carried a rider, plainly printed and easily readable, which contained, in part, the following language:

"This bill of lading is subject to all provisions of a certain charter party or freight contract under which this shipment is made, and is without prejudice thereto, and the carrier shall have a lien on the goods for all freights, primages, demurrages, and other charges payable under the terms of said charter party or freight contract."

Across the face of one of these bills, this notation was stamped:

"Steamer finished loading Jan. 21, 4 p. m.   Lay days began Jan. 20, 7 a. m.

Total time as above. Allowance as per Munson S. S. Line report time used as above."

Two of the other documents contained similar markings, varying, however, in that each indicated the time consumed in loading the shipment covered by the bill. Immediately below such notations, another stamp appeared in large letters. It was as follows:

"If any demurrage has been incurred, the cargo covered by this B/L is liable for its proportion, computed on the basis as established by the Joint Committee on West Indies Transportation."

The charter of the vessel contained clauses as quoted below:

"Demurrage in loading and discharging, except as provided below, shall be payable by the charterer or his agent day by day, on the basis of forty-eight cents (48¢) U. S. currency per gross registered tonnage of vessel per day. * * * "

"Demurrage at loading port shall be indorsed upon bills of lading, but, whether so indorsed or not, upon proof of its having been incurred at said loading port, shall become a lien upon the cargo, and shall be collectible in the same manner as the freight money."

"Bills of lading on approved form shall be signed without prejudice to this charter, and shall be subject to this contract as to freight, dead freight, and all other conditions, including loading, discharging, demurrage, and dispatch. * * * "

"Vessel shall have an absolute lien on cargo for freight, dead freight, and demurrage, both loading and discharging."

The vessel reached New Orleans on or about February 4, 1920, and delivered her cargo to respondent, and freight on the shipment was paid in installments on February 6, 7, and 20, 1920, respectively. This procedure was followed in order to have the freight charge computed on weights as shown by the government weighers. Nothing was said concerning demurrage charges until July 27, 1921, when the agent for Windward Islands Line addressed a letter to respondent, requesting payment for demurrage which was said to have accrued, not only at Cardenas and Matanzas, but at New Orleans, as well. The demurrage accruing at New Orleans was paid in 1921, but there has been a failure to pay that which accrued in Cuba.

In the meantime, and on April 28, 1921, E. R. Sherburne Company, from whom respondent purchased the bills of lading, was adjudicated a bankrupt, and recovery of the demurrage cannot be had from the estate in bankruptcy, either by the owner of the vessel or the receiver of its cargo.

The United States, as owner of the vessel, which was chartered by its agents, United States Shipping Board Emergency Fleet Corporation and Munson Steamship Line, to L. R. Munoz, now seeks to recover the demurrage charges which accrued at Cardenas and Matanzas.

Respondent asks that the libel be dismissed upon the following grounds:

(1) That libelant has not established that the vessel was ready and prepared to load 6,000 bags of sugar per working day, as provided by the charter.

(2) Under the usages in the sugar trade, the vessel was obligated to notify the receiver of the cargo, before the discharge thereof, of any charges accruing at the loading port.

(3) No implied contract to pay any demurrage which may have accrued at the port of loading was created by the acceptance of the cargo.

(4) Libelant has been guilty of laches.

■ As for the first point, it may be taken as proved that the vessel was delayed beyond her lay time at both Cardenas and Matanzas, and that at least a part of such delay was due to the absence of cargo to be laden on board. It may be that some time was lost as a result of a shortage of stevedores, who were to be furnished by the vessel; but the proof of the extent of such loss rests upon respondent, and it is not necessary for libelant, in order to recover for loss of time occasioned by charterers, to show that it was in no way responsible for a part of the delay to the vessel.

■ With respect to the second defense set up by respondent, it is my opinion that the asserted usages of the sugar trade, which have to do with the practice of various carriers in notifying consignees of cargo of the accrual of demurrage at foreign loading ports, prior to the arrival of a delayed vessel at destination, cannot be permitted to overcome the contractual rights and obligations of parties who have contracted for a course of conduct which may differ from the usages on which reliance is here placed.

The most that can be said of the alleged usage is that the receiver of cargo on vessels which are entitled to demurrage accrued at a foreign port is *usually* informed of such accrual prior to the vessel's arrival, or before the cargo is fully delivered. If

the receiver then pays or secures the payment of the lien, all the cargo is delivered; otherwise, a lien is placed upon enough of it to protect the vessel.

█ So far as the usage of the trade is concerned, if such it may be called, and assuming, but not deciding, that it requires a notice of the lien to be given to the receiver of cargo prior to its discharge from the ship, the stamped notations, appearing on the Cardenas bills of lading, were quite enough to put respondent upon inquiry as to what the fact was in this case. The shipping documents fairly shrieked: "Beware of demurrage liens." "If any exist, you, the receiver, are responsible for your proportion of the same."

Not only did they do this, but, in connection with the charter, which was incorporated in the bills, they furnished some basis of calculation from which the lien which arose at Cardenas might be computed. Under these conditions, it seems to me that respondent should be held liable, as under an implied contract, for such delay to the ship as took place at Cardenas through the fault of the charterer. Yone Suzuki & Co. v. Central Argentine Railway, Ltd. (D. C.) 275 F. 54; Id. (D. C.) 19 F.(2d) 645; Vittorio Emmanuele III (U. S. v. Ashcraft-Wilkinson Co.) (D. C.) 18 F.(2d) 977, 1927 A. M. C. 872. The cargo, having been accepted in the face of the warnings of the possibility of a lien, must be assumed that, when the ship released the cargo, respondent agreed to pay the amount of such demurrage to the owners of the vessel.

█ The notices on the bills, issued at Matanzas, as to the responsibility of the respondent for such lien as might have arisen at that port, are not so striking as those on the papers evidencing the Cardenas shipment. But, even so, the delivery of the several shipments on the vessel was a single transaction, and inquiry made as to possible liens upon the portions of the cargo which originated at Cardenas would, in all probability, have revealed whether or not it was claimed that demurrage accrued at Matanzas. I think, therefore, that respondent should be held to liability for demurrage arising at both ports.

█ From what has been said, the alleged laches of the government, in asserting its claim, if such defense were otherwise available to defendant, should not bar a decree in its favor. Had respondent itself been diligent in taking note of the conditions under which it received the cargo, it would have discovered the extent of its liability, and might have sought the protection to which it was entitled from E. R. Sherburne & Co.

The calculation of demurrage, under the charter party and upon the facts, should be made by a master, and a reference to such officer will be made. Respondent may then establish, if it can, what portion of the delay was due to the fault of the vessel.