THE LAKE PACHUTA.

THE LAKE GALERA.

THE CHAPPELL.

UNITED STATES v. JAMISON et al.
(two cases).

SAME v. LAMBORN et al.

District Court, S. D. New York.
Aug. 6, 1930.

Charles H. Tuttle, U. S. Atty., of New York City (Harold F. Birnbaum, of New York City, of counsel), for libelant.

Van Doren, Conklin & McNevin, of New York City (Alfred C. B. McNevin, of New York City, of counsel), for respondents Lamborn & Co.

Palmer & Furman, of New York City (Courtland Palmer, of New York City, of counsel), for respondents Arbuckle Bros.

HAZEL, District Judge.

We are concerned herein with three separate libels in personam filed by the United States to recover demurrage for delay in loading bags of sugar at the loading port on the steamers Lake Pachuta, Lake Galera, and Chappell; and, since similar issues and the same points of law are presented, the parties consented that the libels be tried together.

In the Lake Pachuta Case, libelant proceeds against Arbuckle Bros. only, on an implied promise to pay demurrage arising from delivery of the cargo without enforcement of the lien. The charter party provides for the transportation of 20,000 bags of sugar, specifies lay time of 4 days 1 hour and 53 minutes, the loading not being completed until after the expiration of 6 days 23 hours and 22 minutes from the time loading began; and it is alleged that there was further delay of 15 hours 45 minutes on the part of the charterer in furnishing clearance documents, in short a delay of 7 days 19 hours and 37 minutes, and that libelant, on arrival of the shipment at the port of New York, was entitled to a lien on the cargo amounting to $9,065.64. On May 27, 1920, at Nuevitas, Cuba, a bill of lading was issued embodying the consignment to Ferrer & Rabassa, who indorsed the same to Arbuckle Bros., the latter paying the freight out of moneys in their hands belonging to the shippers, and to whom the cargo was subsequently delivered. No claim or demand for demurrage was made at such time by libelant's agent or master of the carrying vessel. The bill of lading includes demurrage in the amount of $9,156.64, calculated at 45 cents per gross registered ton per day of 24 hours, over 2,416 gross tonnage of the vessel. The bill of lading also contained a provision for payment of freight and demurrage and the carrier's lien therefor. Before suit was brought, Ferrer & Rabassa became bankrupt, but prior thereto Arbuckle Bros. had paid the balance due on freight out of moneys in their hands owing to the shipper. The bill of lading contained a provision that its issuance was "subject to all provisions of the charter party" and the official announcement of the United States Shipping Board Emergency Fleet Corporation

authorized for the West Indies Sugar Crop Season, 1918-19; also for a carrier's lien arising from full freight and demurrage, while the charter party had printed on its upper end the words "United States Shipping Board Emergency Fleet Corporation," and C. H. Sprague & Son are named as owners or chartered owners of the steamship.

In the Lake Galera Case the libel is against Lamborn & Co. and Arbuckle Bros. The two bills of lading, assigned by the former to the latter, cover 20,000 and 1,997 bags of sugar for delivery at New York. The amount sought to be recovered is $8,661.84. Costs and freight were paid by the assignor by way of deduction of account, percentage payment on sight, balance on final settlement of weights and tests, and cargo released by the carrier. No demand at such time had been made by libelant's agent or master of the ship for demurrage at the loading port. The charter party was between L. R. Munoz & Co. and the Earn Line Steamship Company, containing a provision that demurrage at loading port be indorsed upon the bills of lading, but, if not so indorsed, demurrage might be shown to have been incurred. The words "United States Shipping Board Emergency Fleet Corporation" were printed on the contract, while the bills of lading were indorsed by Lamborn & Co. and contain notations specifying time of loading and completion, together with a printed phrase relating to demurrage. There is, however, no specific claim for demurrage incurred at loading point. From the Lake Galera shipment, Arbuckle Bros. received its purchase of 20,000 bags of sugar, and Lamborn & Co. sold the balance—1,997 bags—to Hires & Co. As between Lamborn & Co. and Arbuckle Bros., the question of primary and secondary liability arises. It is also shown that importations of dutiable sugar are customarily delivered to the consignee or his assignee upon filing an indorsed bill of lading in the Custom House, and a permit for discharge is transmitted to the customs officer at the pier. Although no indorsed copy was surrendered to the ship's master, I nevertheless think that paragraph 5 of Exhibit H is phrased broadly enough to include indorsement for entry and delivery of the merchandise.

As to the steamer Chappell, respondent Lamborn & Co. is charged with liability on its express promise to pay demurrage for delay in loading, amounting to $1,901.76, on condition that the lien be not enforced. Munoz & Co. were sellers, and all four bills of lading were issued, indorsed, and accepted by respondent. They contain notations relating to arrival of the Chappell, loading, completion of loading, and date of clearance. No claim is made for any demurrage arising from loading at Antilla. The cargoes of sugar, covered by Exhibits 3 to 6 (the Nuevitas lading), were destined to Philadelphia, and the bills of lading on the form of the West India Steamship Company, agent of the United States Shipping Board, Munoz charterer of the vessel. The bills of lading contain no notation indicating that demurrage had been incurred at the port of loading, and libelant relies on Lamborn & Co.'s agreement to pay the demurrage in question. About June 11th, the West India Steamship Company billed Lamborn & Co., agent for Munoz & Co., for demurrage, and requested a guaranty of payment. In reply Lamborn & Co. wrote that it guaranteed on behalf of Munoz & Co. "to pay any demurrage which can be legally proved to have been incurred for account of the shippers while loading at Nuevitas," and upon its receipt libelant waived its right to enforce the lien and delivered the bags of sugar on the indorsement contained on the bills of lading. Subsequently Lamborn & Co. refused to pay the bill on the ground that no authority had been received from Munoz & Co. to pay the account, but later the latter offered to pay half the amount which libelant refused to accept. The charter party is on a printed form of the United States Shipping Board Emergency Fleet Corporation and describes the West India Steamship Company as its agent. Lamborn & Co., as brokers for Munoz & Co., sold the cargoes to the Pennsylvania Sugar Company, the c. and f. charge paid by Lamborn & Co. out of the sales price as per agreement. It is not deemed necessary to specifically refer to the various bills of lading covering the various shipments, or to detail the testimony in relation thereto.

In each case respondents challenge the right of the United States to bring actions and allege that laches bars recovery, and generally that they are not liable for loading port demurrage. I think the government's contention that the charter party and bill of lading are to be construed together is sound, and, upon doing so, it is reasonably clear that the various shipments were made in behalf of the United States as owner of the carrying vessels, and that the charterers were its agents. That Lamborn & Co. and Arbuckle Bros. were not specifically named in the charters, which on their faces did not in express terms purport to have been made on behalf of the United States either as stat-

ed principal or agent, is insufficient reason for sustaining the defenses. Concededly the United States owned the carrying vessels; and the fact, as I find it to be, that the management of the vessels by the West India Steamship Company, C. H. Sprague & Son, and Earn Line Steamship Company, was supervised by the Fleet Corporation, sufficiently indicated the shipment on behalf of libelant. The several libels in personam were properly brought by the United States in its sovereign capacity and pursuant to section 11 of the Suits in Admiralty Act (46 USCA § 751).

██ It is true that Munoz & Co. had also become insolvent, but respondents were in a position to deduct the demurrage charges from the purchase prices under the agreement with the shipper. The probability of demurrage at the loading port was fairly suggested by the notations on the bills of lading which gave adequate notice thereof—sufficient, I think, to put respondents on inquiry. Although there was testimony that demurrage was customarily collected in the sugar trade on discharge of the vessel or the right to collect was lost or waived, I do not regard that any such custom has been satisfactorily proven. That the United States was a proper party to sue, as owner of the vessels, even though the shipping arrangements were made by the Shipping Board Emergency Fleet Corporation, or through another duly authorized agent, was definitely decided in U. S. v. Czarnikow-Rionda Co. (C. C. A.) 40 F.(2d) 214, and in Weinstein v. Black Diamond S. S. Corp. (C. C. A.) 40 F.(2d) 590, the action was brought against the Fleet Corporation and the Black Diamond Steamship Corporation for recovery on a claim for cargo damage, but the complaint was dismissed on the ground that the court was without jurisdiction in a suit against an agent of the government for doing an act within the scope of his authority. These two cases clearly indicate, I think, that the United States is the proper party to proceed on the charter parties to recover demurrage on deliverance of the cargo at the port of discharge to the consignee or their assigns. The right was not lost by failure to make demand at the time of delivery of the cargo. Lamborn & Co. and Arbuckle Bros. took the cargo in pursuance of the bills of lading and their indorsements thereon, under an implied promise to pay the charges for which a lien could have been enforced. United States v. American Sugar Refining Co. (D. C.) 28 F.(2d) 140. In that case Judge Knox ruled that the charter was incorporated in the bills of lading, and, since the cargo had been accepted "in the face of the warnings of the possibility of a lien," it must be assumed that upon release of the cargo, the receiver agreed to pay the amount of the demurrage to the owners of the vessel. There are other adjudications cited in Judge Knox's opinion which in principle uphold this view.

██ It is further urged that the Lake Pachuta and Lake Galera bills of lading indorsed by Montgomery & La Bonte were for customs duties only, but, since it is shown that dutiable Cuban sugar is usually delivered and discharged by simply filing an indorsed bill at the Custom House without delivering the same to the master of the ship or the owner, the contention of nondelivery to the latter is not of controlling weight. The agent had authority to indorse the bill of lading to insure customs entry, and also for the purpose of receiving the cargo, as indicated by clause 5 of charter party. Precedents are cited that under the common law the shipowner has the right of lien on the freight, and that on its unconditional release the lien for demurrage at the loading port is destroyed. I think that the fact that no statutory right in personam exists against the consignee or receiver of goods does not imply that a debtor may escape liability upon an obligation which he is equitably bound to meet; for in certain respects courts of admiralty act as courts of equity and according to what is just and right. Plummer v. Webb, Fed. Cas. No. 11233. And see Yone Suzuki Co. v. Cent. Argentine R. Co., Ltd., (D. C.) 275 F. 54, affirmed (C. C. A.) 27 F.(2d) 795; U. S. v. Ashcraft-Wilkinson Co. (D. C.) 18 F.(2d) 977, cases wherein in this circuit the general contract of implied promise to pay demurrage by the receiver of the cargo was applied.

In the Yone Suzuki Case, supra, Judge Learned Hand stressed the principle of implied promise to pay demurrage as arising from the relationship between the shipper and the carrying vessel as evidenced by the charter party and bill of lading. There, as here, proctors argued that demurrage at the port of loading is on a different basis than c. and f. at the port of discharge. But the learned court, among other things, said that it is a question of the extent of the shipper's lien, and the lien depends altogether upon the language of the bill of lading and the charter party. See, also, Vane v. A. M. Wood & Co. (D. C.) 231 F. 353.

There is prima facie evidence that there

was recoverable delay at the port of loading, which respondents have not rebutted. The Hans Maersk (C. C. A.) 266 F. 806.

The actions were begun within six years, and the question of estoppel for laches must be overruled. See U. S. v. Czarnikow-Rionda Co. supra, wherein it was held that laches does not bar a suit by the United States to recover demurrage as an assignee of the Fleet Corporation. See, also, Davis v. Corona Coal Co., 265 U. S. 222, 44 S. Ct. 552, 68 L. Ed. 987.

Testimony in the Chappell Case, I think, was sufficient to warrant holding that there existed an express promise to pay the disputed demurrage, in view of libelant refraining from enforcing the lien at the time of delivering the cargo to Lamborn & Co.'s purchaser.

Libelant is entitled to a decree in its favor with costs; the amount of demurrage, however, to be ascertained by a master empowered to determine primary and secondary liability as to the Lake Galera shipment, and generally to take evidence tendered by respondents as to the fault of the delay of the vessel and its extent. So ordered.