**John PAVLAKIS**

v.

**SEACREST SHIPPING COMPANY, Inc., and Bethlehem Steel Company.**

**No. 3723.**

United States District Court
D. Maryland, Admiralty Division.
Dec. 21, 1955.

554

R. Lewis Bainder, Hillman & Hillman, Baltimore, Md., for libellant.

Jesse Slingluff, Jr., Piper & Marbury, Baltimore, Md., for Bethlehem Steel Co.

Ober, Williams, Grimes & Stinson, Baltimore, Md., for Seacrest Shipping Co., Inc.

CHESNUT, District Judge.

This is a suit in admiralty by libel in personam in which the libellant seeks to recover damages for personal injuries sustained on the ship "Jonancy" operated by the Seacrest Shipping Company, Inc. The libellant is a citizen of Greece who was employed as Chief Engineer on the ship. The Seacrest Shipping Company, Inc., was the operator of the ship which is said to be owned by a Panamanian corporation which had the ship registered in Liberia. The well-known Bethlehem Steel Company is a foreign corporation which has shipbuilding and repair plants in Maryland. At the time of the injury the ship was in a graving dock at the lower yard of the Bethlehem Company at Curtis Bay in the harbor of Baltimore. The admiralty jurisdiction is not disputed. In the libel the libellant claims damages based on negligence both

by the ship and the Bethlehem Company, and also claims additional loss of wages and maintenance and cure against the ship.

On December 28, 1954, the libellant, then in New York City, was employed by the ship as chief engineer and ordered to report to the ship at Baltimore the following day. The ship was then undergoing repairs by the Bethlehem Company, particularly to the engine of the ship. On December 29, 1954, while the libellant was in the engine room of the ship, a two-end "star" wrench weighing ten pounds, fell from an upper level in the engine room and after striking at one or more places, finally in its fall hit the libellant on the head. Immediately thereafter he went to the first-aid station of the Bethlehem Company near the ship and was later sent to the United States Public Health Service Hospital (more briefly called the Marine Hospital) in Baltimore where his injury was diagnosed as lacerations of the head and brain concussion, mild. He remained at the hospital until February 1, 1955 when he was discharged with the notation that his condition was improved and that he was then fit for continued service. On his first employment in New York the libellant's rate of compensation was fixed at $400 a month with a bonus determined at the rate of $30 a month. At the time of the accident he had not yet signed Articles on the ship and the extent and duration of the voyage had not been determined.

The answer of the ship admits liability for one month's wages in the amount of $430, of which $200 has heretofore been paid. It denied liability for maintenance or for negligent injuries. The answer of the Bethlehem Company in effect denies any liability for injuries and asserted absence of knowledge as to the exact cause of the injury.

Precisely what caused the wrench to fall was the subject of highly contradictory evidence given on the one part by the 2nd and 3rd engineers of the ship, and on the other by two workmen for the Bethlehem Company who were at the time engaged in removing a large number of nuts from the top of the high pressure cylinder of the engine by the use of a wrench or wrenches; much of the evidence as to the surrounding circumstances, however, is not in dispute. From the evidence as a whole I make the following findings of fact.

The engine room of the ship is similar to that of many seagoing ships. The engine itself is, of course, a very large machine extending in height 20 or 30 feet from the floor of the engine room to near an upper deck of the ship. There are four levels in the engine room; on the topmost level there was a catwalk running athwart ship which was on a level with the main deck; the next level consisted of a catwalk approximately 3 feet below the heads of the engine, running lengthwise of the ship; below that about 6½ feet were similar catwalks running lengthwise of the ship and a foot or two out from the engine; and the next level was a deck at the bottom of the engine room which was open on all sides of the engine. Outside of the catwalks is a considerable space of possibly 15 or 20 feet to the skin of the ship. The top of the engine where the Bethlehem workmen were engaged was two or three feet above the level of the second catwalk from the bottom. The wrench that fell and struck the libellant was 26 inches long and the diameter of the ends of the wrench which were intended to fit over the nuts to be loosened was on one end 3³⁄₁₆ inches and on the other 3⅛ inches. It weighed ten pounds. The wrench belonged to the ship. It is admitted by counsel for the Bethlehem Company that on his visit to the ship with other counsel after the accident, it was found that the wrench would fit some of the nuts on the top of the engine which the Bethlehem workmen were ordered to loosen and remove preparatory to opening the head or top of the engine. At the time of the accident one of the ship's engineers was on a catwalk or level just above where the Bethlehem workmen were engaged. On the bottom of the engine room there were 10 or 15 employees of the Bethle-

hem Company or the ship at the time engaged in various activities. The libellant, the chief engineer, who had been occupied on the upper level of the engine room, had been called down by one of the Bethlehem workmen to examine or give some instructions with regard to the condenser. It was while he was so engaged on the lower engine room floor that the wrench was dislodged or dropped and its noise in falling was distinctly heard by himself and others, but after striking one or more objects in its fall it finally hit the libellant on the head. Apparently the last stage of its flight was only a few feet from the libellant's head.

After the libellant's discharge from the Marine Hospital he was sent by his lawyer to consult a private neurologist who was a witness in the case, Dr. Teitelbaum. The libellant reported back to the ship and signed Articles for one or more voyages on February 17, 1955. He served as chief engineer until November 2, 1955 when he left the ship at Philadelphia, Pennsylvania, after making a complaint to the Captain that he was unable to continue his work. He was referred to the ship's insurer in New York where he says he was told to report further to the Marine Hospital at Baltimore. The libellant testified that at times between February 17 and November 2nd he was not well; had at times experienced momentary or slight dizzy spells; had some continuing headache and, in August 1955, when the ship was at Jacksonville, Florida, that he reported his indisposition to the ship's Captain and was sent ashore to the Public Health Service there. He says he had also bought some medical preparations or drugs elsewhere during that period which had given him some temporary relief. On returning to Baltimore about November 10, 1955, shortly before the assigned date for the trial of the case, he again on two or more occasions consulted Dr. Teitelbaum. He did not report to the Marine Hospital in Baltimore at that time or prior to the trial.

Exactly what caused the wrench to fall is involved in highly contradictory evidence but I find from the evidence as a whole the following.

The ship's wrench referred to had been given to the Bethlehem workmen Crist and Keyser. This was denied by them. They said that they had at no time used the ship's wrench but that they had been engaged in "breaking loose" the nuts by striking the handle of a Bethlehem wrench with a 12 pound mall while it was inserted over the nut to be broken loose. On the other hand, the deposition of Delfis, the ship's third engineer, was to the effect that while he was on a catwalk level just above the top of the engine where Keyser and Crist were working, he saw them, or one of them, using a wrench which he evidently thought was the ship's wrench that fell. He did not directly see the immediate fall of the wrench because he had momentarily looked away at something else, but he did hear the noise made by the wrench in falling. When the wrench started to fall the Bethlehem workmen or one of them called out a warning to those below. Keyser was on top of the engine holding the wrench that he says he was using, which was not the wrench which fell. Crist was standing on the catwalk, the level of which was two or three feet below where Keyser was holding the wrench. Crist was using the mall (practically a sledge hammer) to aid the wrench in breaking loose the nut. Crist says that while so engaged in using the mall his foot struck something or he stepped on something under his foot, and loosened it, causing it to fall. He says he did not see the object before his foot knocked it loose from the catwalk, but that in endeavoring to recreate the scene some days thereafter he had the photographer place the wrench which fell at a particular place near the edge of the catwalk where he thought it must have been. Crist and Keyser had been working in their particular locations for some time before the wrench fell.

On the whole evidence, although directly contradictory, I find that Keyser and Crist, one or the other, did at some time use the ship's wrench in their work

and that if the wrench which fell and struck the libellant did not immediately fall from the hands of Crist or Keyser while using it, it must have been temporarily placed by Crist on the catwalk while using a different wrench with the mall. I infer also from the evidence as a whole that although Crist says he did not see the wrench which was displaced and caused to fall by his foot, he could very well and should, in view of all the circumstances, have seen it while lying on the catwalk so near the edge, and particularly in view of the fact that there were ten or more men working in, around and about the engine room 20 feet below. I therefore find and conclude as a fact that the fall of the wrench was due to the negligence and lack of due and ordinary care on the part of Crist or Keyser or both. I do not find any negligence on the part of the libellant.

In argument counsel for the Bethlehem Company suggested that the wrench which fell may have been inadvertently placed on the catwalk by some member of the ship's crew; but there is no evidence in the case to support this contention other than pure speculation, because there is positive evidence in the deposition of the second engineer of the ship that the wrench had been given to the Bethlehem workmen for use in removing the nuts from the engine head. The only judicial decision with respect to lack of negligence cited by counsel for the Bethlehem Company is Combustion Engineering Co. v. Hunsberger, 1936, 171 Md. 16, 187 A. 825. As this case is a suit in admiralty, the Maryland decisions are not controlling under the principle of Erie R. Co. v. Tompkins, 304 U. S. 64, 58 S.Ct. 817, 82 L.Ed. 1188. Nevertheless as the case dealt with the general question of negligence, I have carefully considered it and found it to be not applicable to the particular facts here involved. There is some similarity in the nature of the accident in that the facts in the Maryland case involved damage to the plaintiff by a fall of a small metallic wedge which was being driven into another metal object and accidentally fell from above and struck the plaintiff below. Under the facts of the case the court found no negligence causing this fall of the wedge since there was no evidence to show carelessness or negligence on the part of the workman who was using the wedge. The plaintiff relied upon the fall of the wedge itself as evidence tending to establish negligence, presumably on the doctrine of res ipsa loquitur. The precise holding of the court in this respect was that the mere fall of the wedge during a building operation (not involving an injury to a person using the highway outside) was not itself evidence of negligence. In the instant case I find there was evidence of negligence causing the fall of the wrench apart from the mere fact that it did fall. The affirmative evidence of one of libellant's witnesses was that the wrench fell while being actually used by the Bethlehem workman in displacing a nut from the engine head. And according to the evidence of the Bethlehem workman, Crist, the cause of the fall of the wrench was that he accidentally stepped on it and knocked it from the catwalk causing it to fall on the libellant below. In either event there was affirmative evidence of negligence on the part of the Bethlehem workman relating to the fall of this wrench. The surrounding circumstances, considering the location of the workmen and the number of persons occupied some 20 feet below, together with the size and weight of the wrench, necessarily required care in handling the tool to avoid its slipping off the nut by undue pressure, or otherwise slipping from the hands of the workman. But equally, if not more so, I think the accidental knocking or displacing of the wrench, if, according to the respondent's testimony, it was lying on the catwalk near the edge, was also negligence under the circumstances. Although Crist, whose foot displaced the wrench causing it to fall, said he did not see it, the fair inference on the whole evidence is that he should have seen it, as he had been working at that place some time prior thereto and also, if the wrench had been placed there by

him, he should have remembered that it was there and in a situation which might well cause danger to those working below, if he accidentally displaced it.

■ The negligence attributed by the libel to the ship was specified to have been the failure to provide the libellant with a safe place to work. I find no basis in fact for this charge on the evidence as a whole. There was nothing wrong with the construction or condition of the engine room and nothing extraordinary or unusual with respect to the necessity for current repairs to the engine; and there was nothing unusual with respect to the performance of his duties by the libellant as chief engineer. I therefore find no negligence causing or contributing to the libellant's injury on the part of the ship.

The next question to be considered is whether, apart from negligence, the ship is liable for wages or maintenance. Counsel for the ship conceded that it owes the libellant $230 for wages. It denies any liability for continued maintenance. Counsel for the libellant contends that he is presently unfit for duty and may require further hospitalization and cure, and if so, should be entitled hereafter to compensation therefor. I do not undertake to pass on that question in this present case. I find there is no accumulated maintenance or cure due from the ship to the libellant at the time of the trial. I understand as a result of the full argument of the case and the colloquies between the court and counsel for the libellant that this finding and conclusion is not really disputed.

In passing it may be noted that at the beginning of the case, counsel for the libellant, in response to a question from the court, stated that he considered the libellant's case was really based on the Jones Act, 46 U.S.C.A. § 688. This, however, was at once disputed by counsel for the ship who cited some judicial decisions, particularly Lauritzen v. Larsen, 345 U.S. 571, 73 S.Ct. 921, 97 L.Ed. 1254, as a holding to the contrary. But I do not think that that case of itself is conclusive of the instant case. There a civil action was instituted in New York for an accident occurring in a foreign port. Suit was based on the Jones Act but the libellant was an alien seaman, the ship was of Danish registry and the law of Denmark did not itself provide for actions based on American statutes. The Supreme Court reversed findings in favor of the libellant and held that the trial court should have declined to exercise jurisdiction under the circumstances. Other authorities to the same effect have also been cited by counsel for the ship, particularly Nakken v. Fearnley & Eger, D.C.S.D.N.Y. 137 F.Supp. 288, 1955 A.M.C. 2021. But under the conclusion reached as to the ship it is unnecessary to prolong the discussion on that point.

As I find that the libellant's injuries were proximately caused by negligence of employees of the Bethlehem Company acting within the scope of their authority, the next question to be considered is the amount of damages to which the libellant is fairly entitled. In the libel damages in the amount of $50,000 are claimed but in the argument counsel for the libellant contended for $5,000 based on estimated loss of earnings for a year and $5,000 for pain and suffering and physical injuries.

■ The burden of proof is, of course, on the libellant to show what sum would be compensatory damages for the injuries sustained. The evidence on the subject is rather meager and not very satisfactory with respect to the nature, extent and probable duration of any disability from injuries. The libellant testified that he did not feel able, after November 2, 1955, to continue his work as chief engineer; that he had headaches and that his hearing and vision were not quite so good as before the accident. There was, however, no definite medical evidence to substantiate the impairment of either sight or hearing. The libellant's complaints are largely of a subjective nature only.

■ Counsel for the libellant places chief reliance on the testimony of Dr. Teitelbaum as a basis for any substantial

award of damages. Dr. Teitelbaum was not consulted for treatment but rather for anticipated testimony in the case. He first saw the libellant about February 7, 1955 and stated that in his opinion the libellant was not really fit for duty at that time. His opinion in this respect was based very largely, if not entirely, on the history of the matter as given to him by the libellant himself, and by the latter's subjective complaints. Despite Dr. Teitelbaum's opinion expressed in February, the libellant signed Articles for employment as chief engineer on the ship on February 17, 1955, and continued to hold that position until November 2, 1955. He has received no medical treatment since that latter date although he has seen Dr. Teitelbaum on several other occasions, one a few days before the trial of the case. The final report of Dr. Teitelbaum is to the effect that he again determined in his opinion that the libellant was not fit for work as chief engineer but that the nature of his condition, resulting from what Dr. Teitelbaum understood to be a brain concussion without brain damage, made it very uncertain as to how long the libellant would be able to continue his employment. There was no other evidence of medical opinion except the brief reference in the testimony to the diagnosis at the Marine Hospital above mentioned. No doctors from the Marine Hospital who had treated and observed the libellant while there for a month were called as witnesses in the case. After considering all the evidence, including the month's wages lost by the libellant and the obvious fact that he must have had some pain and suffering from the blow on the head, and distress and inconvenience by a month's hospitalization, I conclude that an award of $1,500 will be fairly compensatory for the damages due to the libellant's injury.

■ The final matter to be considered is the form of decree particularly in relation to the liability of the Bethlehem Company and that of the ship respectively. The ship admits its liability to the libellant for $230 on account of balance of unpaid wages, due for one month, but denies any liability for maintenance and cure up to the time of the trial. And I conclude that the only sum for which the ship is responsible is $230, which does not include any allowance for maintenance up to the time of the trial. I find no satisfactory evidence that the ship has failed to pay or was required to pay any sum for maintenance and cure up to the time of the trial. While the libellant left the ship at the end of its voyage and of his employment on November 2, 1955, he has not actually sought and obtained medical attention since then. See Bowers v. Seas Shipping Co., 4 Cir., 185 F.2d 352: The Jadden, D.C.E.D.La., 1937 A.M.C. 177; The Baymead, 9 Cir., 88 F.2d 144.

■ As the libellant's injuries and loss of wages therefrom were proximately caused by the negligence of the Bethlehem Company, it is my opinion that the Bethlehem Company should stand the entire loss and the libellant is not entitled to be doubly compensated for loss of wages, once by the Bethlehem Company and secondly by the ship. Therefore the decree in favor of the libellant should provide that if and when Bethlehem pays $1,500 to the libellant, there should be no separate and additional payment for wages of $230 balance by the ship; but that if for any reason Bethlehem does not pay the amount of $1,500 and taxable court costs to the libellant, or if it should be ultimately held on appeal that Bethlehem is not liable to the libellant, then the Seacrest Shipping Company, Inc., the operator of the ship, should pay the amount of $230 to the libellant and also pay any taxable court costs in the case not otherwise paid by the Bethlehem Company.

I think this particular form for the decree will be in accordance with proper practice in this case because both respondents have been sued together and the whole matter of their liability to the libellant should be decided even though there has been no procedure with respect to interpleading as between the respondents under Admiralty Rule No. 56, 28 U. S.C.A. The principle involved is, how-

ever, implicit in Rule 56 which was adopted about 70 years ago to avoid multiplicity of suits and circuity of action in accordance with the principles of equity generally applicable to admiralty. See the discussion in Moore's Fed. Practice, Vol. 1, § 14.03 at pages 749–755. See also Jones v. Waterman S. S. Corp., 3 Cir., 155 F.2d 992, and seemingly contra, Vane v. A. M. Wood & Co., D. C., 231 F. 353.

Counsel may submit the appropriate decree.